STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

08-158

JOSEPH H. FONTENOT, JR.

VERSUS

WAL-MART

**********

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION - DISTRICT  4
PARISH OF LAFAYETTE, NO. 04-07245
ELIZABETH A. WARREN AND SHARON MORROW, WORKERS'
COMPENSATION JUDGES

**********

ULYSSES GENE THIBODEAUX
CHIEF JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, John D. Saunders, Marc
T. Amy, Billy H. Ezell, and James T. Genovese, Judges.

AMY, J., DISSENTS AND ASSIGNS REASONS.

GENOVESE, J., CONCURS IN THE RESULT.

AFFIRMED IN PART, REVERSED IN PART
AND RENDERED, REMANDED IN PART.

Frank A. Flynn
Desiree C. Williams
Allen &  Gooch
Post Office Drawer 3768
Lafayette, LA  70502-3768
Telephone:  (337) 291-1635
COUNSEL FOR:
        Defendant/Appellee - Wal-Mart Stores, Inc.

James S. Gates
Morrow, Gates, & Morrow, LLC
Post Office  Drawer 219
Opelousas, LA   70571-0219
Telephone:  (337) 942-6529
COUNSEL FOR:
        Plaintiff/Appellant - Joseph H. Fontenot, Jr.

**THIBODEAUX, Chief Judge.**

This case involves the workers' compensation claims of the claimant-appellant, Joseph H. Fontenot, Jr., against the employer-appellee, Wal-Mart. The Office of Worker's Compensation ("OWC") granted judgment partially favoring Wal-Mart and partially favoring Mr. Fontenot. The OWC found that Mr. Fontenot's back and knee injuries were caused by his work-related injury in February 2003 and ordered Wal-Mart to pay all outstanding medical expenses incurred on or before September 28, 2004.

The OWC further found that Mr. Fontenot's subsequent wound complications were the result of intentional self-injury under La.R.S. 23:1081(1)(a) and decided in favor of Wal-Mart's termination of medical and wage benefits on September 28, 2004. However, finding that Mr. Fontenot was not a malingerer, the OWC denied Wal-Mart's fraud claim against Mr. Fontenot.

Mr. Fontenot appealed the portions of the judgment that favored Wal-Mart. Having determined upon review that Wal-Mart did not meet its burden of proving intentional self-injury, we reverse the portions of the OWC Judgment favoring a termination of benefits and order Wal-Mart to pay medical and wage benefits as explained below.

I.

**ISSUES**

We must decide:

(1)     whether the OWC manifestly erred in its reliance upon Wal-Mart's psychiatrist rather than Mr. Fontenot's treating wound specialist in terminating benefits under La.R.S. 23:1081(1)(a); and,

(2)     whether the OWC manifestly erred in finding no arbitrary and capricious behavior on the part of Wal-Mart.

## II.

## FACTS AND PROCEDURAL HISTORY

In February 2003, Joseph H. Fontenot, Jr., a thirty-three-year-old manual labor employee, twisted and injured his back when he fell after lifting an eighty-pound pallet at the Wal-Mart Distribution Center in St. Landry Parish. Two weeks later, he underwent a discectomy at L4-5 for the repair of the ruptured disc. Mr. Fontenot continued to have back and leg pain and was re-admitted to the hospital in March 2003. While hospitalized, Mr. Fontenot fell on his right knee, apparently hitting a metal bed rail and the floor. Mr. Fontenot was diagnosed with a medial meniscus tear in his right knee. He had also suffered a bruise and collection of blood under the skin, or hematoma, in his right thigh about five inches above his knee. The hematoma in his thigh became stagnant and clotted; the blood had nowhere to go. Eventually, Dr. Toby Broussard opened up the area and drained it, which should have resulted in healing. However, healing was delayed. Mr. Fontenot underwent knee surgery with Dr. Malcolm Stubbs in June of 2003, and the operation site also experienced delayed healing.

In July of 2003, Mr. Fontenot reported that the sutures from the knee surgery had come out during physical therapy. Mr. Fontenot developed an infection and re-entered the hospital. Dr. Stubbs irrigated the knee and closed the wound, remarking that he had never seen such complications with post-operative healing. Mr. Fontenot's wounds kept opening back up instead of healing. Mr. Fontenot was treated for wound care in Lafayette and at his home through home health, and he continued to experience complications. He was put on various antibiotics, experienced allergic reactions, developed a clot in his arm, and was put on Coumadin. Even his intravenous (IV) sites became inflamed with redness and swelling.

2

In August of 2003, Mr. Fontenot's family physician since 2001, Dr. Michael Burnell, recommended wound care at the Opelousas General Hospital Wound Care Center (Opelousas General), which happened to be in Mr. Fontenot's hometown. Wal-Mart's case manager at Corvel, the case management company, insisted that Mr. Fontenot be sent to Baton Rouge for wound care. There were complications, and the wounds continued to resist healing. Mr. Fontenot was sent to numerous specialists and several medical facilities between July 2003 and July 2004. Even the Mayo Clinic was discussed at one point. He saw a total of approximately seventeen physicians during the course of his treatment following the February 2003 injury at the Wal-Mart Distribution Center.

On July 12, 2004, while being treated at Promise Health Care in Baton Rouge by plastic surgeon Dr. Anthony Stephens, Dr. Stephens' skin graft became dislodged when Mr. Fontenot pulled up his bed covers. Dr. Stephens re-attached the skin graft onto the thigh wound with instructions to remain very still so that the graft could take. The next day, on July 13, 2004, Mr. Fontenot was discharged after his benefits were terminated by Corvel. The benefits were reinstated for the purpose of sending Mr. Fontenot for a psychological evaluation. On July 30, 2004, Mr. Fontenot returned to Dr. Stephens who reported that Mr. Fontenot's wound had healed, that he had reached maximum medical improvement, and that he had no work limitations with regard to the thigh wound. However, the wound, which had experienced tunneling deep into the groin area, subsequently opened back up.

In August of 2004, Wal-Mart had Mr. Fontenot examined by a psychiatrist, Dr. Rennie Culver. Dr. Culver reported on September 21, 2004 that Mr. Fontenot was malingering and had a factitious/psychological disorder with evidence of self-inflicted injury for the purpose of remaining in the role of a patient.

3

On September 28, 2004, Wal-Mart terminated Mr. Fontenot's medical and wage benefits, even though no functional capacity evaluation had been done to determine Mr. Fontenot's limitations due to the back and knee surgeries. In October 2004, Mr. Fontenot filed a disputed claim form, seeking reinstatement of the medical and wage benefits and alleging arbitrary and capricious conduct on the part of Wal-Mart in terminating his benefits.

Taking control of his own care, Mr. Fontenot went to the specialist recommended by his family physician over a year prior. From October 11 through November 22, 2004, Mr. Fontenot was treated in his hometown of Opelousas by Dr. Kerry Thibodeaux, director of the Wound Care Center of Opelousas General Hospital. Dr. Thibodeaux reported that the thigh wound was as large as thirty-five square centimeters at the first visit on October 11. By October 26, after treating Mr. Fontenot with special dressings, Dr. Thibodeaux had reduced the size of Mr. Fontenot's wound by fifty percent. After six weeks of treatment, Dr. Thibodeaux discharged Mr. Fontenot with a ninety-eight percent reduction in the size of his wound. Wal-Mart did not pay for this treatment with Dr. Thibodeaux and Opelousas General.

The matter proceeded to trial and was heard by OWC Judge Sharon Morrow in February 2006. Subsequently, Judge Morrow recused herself due to conflict issues. The case was reassigned to Judge Elizabeth Warren. Judge Warren decided the case upon her review of the record, without benefit of live testimony. While finding the back and knee injuries causally related to the work injury, Judge Warren found the wound complications a result of self-inflicted injury and upheld Wal-Mart's termination of benefits under La.R.S. 23:1081(1)(a). This finding was largely the result of Judge Warren's reliance upon the testimony of Wal-Mart's

4

psychiatrist, Dr. Culver, and the judge's apparent disregard of the testimony of Mr. Fontenot's family physician, Dr. Burnell, and his wound specialist, Dr. Thibodeaux, who actually cured Mr. Fontenot in a matter of weeks. Judge Warren also found credibility issues with Mr. and Mrs. Fontenot in spite of not having witnessed their testimony at trial. Mr. Fontenot filed a motion for a new trial, which was denied by Judge Warren.

We reverse the termination of benefits and order Wal-Mart to pay all medical expenses related to Mr. Fontenot's February 2003 work accident. This includes the back injury and surgery, the knee injury and surgery, and the expenses related to the care of the bruises and wounds that occurred along with the knee injury. We remand the case to the OWC for a determination of wage benefits as more fully set forth below.

III.

## LAW AND DISCUSSION

### Standard of Review

The supreme court has discussed the standard of review in workers' compensation cases as follows:

> In worker's compensation cases, the appropriate standard of review to be applied by the appellate court to the OWC's findings of fact is the "manifest error-clearly wrong" standard. *Brown v. Coastal Construction & Engineering, Inc*., 96-2705 (La.App. 1 Cir. 11/7/97), 704 So.2d 8, 10, (citing *Alexander v. Pellerin Marble & Granite,* 93-1698, pp. 5-6 (La. 1/14/94), 630 So.2d 706, 710). Accordingly, the findings of the OWC will not be set aside by a reviewing court unless they are found to be clearly wrong in light of the record viewed in its entirety. *Alexander*, 630 So.2d at 710. Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.

5

*Robinson v. North American Salt Co.*, 02-1869 (La.App. 1 Cir. 2003), 865 So.2d 98, 105[, *writ denied,* 03-2581 (La. 11/26/03), 860 So.2d 1139].

*Dean v. Southmark Const.*, 03-1051, p. 7 (La. 7/6/04), 879 So.2d 112, 117.  With

regard to credibility findings, we have further articulated:

> When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said.  Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination.

*Custis v. Whitaker Const.*, 95-1110, p. 8 (La.App. 3 Cir. 1/31/96), 670 So.2d 339,

344, *writ denied,* 96-553 (La. 4/19/96)*,* 671 So.2d 920 (quoting *Bruno v. Harbert*

*Int'l, Inc.*, 593 So.2d 357, 361 (La.1992)) (quoting, *Rosell v. ESCO*, 549 So.2d 840,

844-45 (La.1989)).

**Termination of Benefits**

Mr. Fontenot contends that the OWC manifestly erred in relying upon

the testimony of Dr. Culver, Wal-Mart's psychiatrist, and in crediting Dr. Culver's

testimony and diagnosis of a factitious disorder while disregarding the diagnoses of

Mr. Fontenot's treating physicians.  We agree.

Dr. Culver met with Mr. Fontenot for one hour and forty-five minutes

in August of 2004.  He neither performed nor reviewed psychological testing or

intelligence testing on Mr. Fontenot.  Nor did he review school records; yet, he

formed specific conclusory judgments about Mr. Fontenot's intellect and his character

based upon an unhappy childhood due to alcoholic, unstable, and neglectful parents.

6

Dr. Culver actually posited a guess that Mr. Fontenot's intelligence quotient was probably around 80 because that is where laborers such as Mr. Fontenot usually fall. The record reveals that while Mr. Fontenot did not complete high school, his own history does not reflect that of his parents. Mr. Fontenot does not drink and has no history of drug or alcohol-related problems; has no criminal history nor legal problems; is not litigious; and, he does not have a negative work record.

Mr. Fontenot has been married once, to Sharon Fontenot, who is a McNeese graduate and certified teacher. They have six children between the ages of two and seventeen, foster children whom they later adopted. At the time of the accident, Sharon Fontenot ran a Christian academy, and was the sole teacher and principal to thirty-one students in addition to her own six children. Mr. Fontenot helped grade workbooks. However, none of Mr. Fontenot's adult history was discussed by Dr. Culver during his deposition. Rather, Dr. Culver involved himself in an interminable discourse and boundless soliloquy regarding the fact that Mr. Fontenot chose to wear shorts to his appointment with Dr. Culver, notwithstanding that the appointment took place in August in south Louisiana. Dr. Culver opined that this choice of clothing was a contrived attempt on the part of Mr. Fontenot to display his wounds and scars. Dr. Culver never considered that Mr. Fontenot was told by his physician to keep his leg uncovered to promote healing.

Dr. Culver's emphasis on the clothing issue and the significance that he accorded it were out of proportion to the minimal coverage that he accorded the substantive information about Mr. Fontenot. Likewise, Dr. Culver provided numerous, detailed, and unsolicited accounts and case histories of behaviors that were not relevant to the case before him. Dr. Culver's testimony was so filled with unhesitatingly breathless acrimony that his agenda would have been apparent to all

7

but the most naive.  Upon review, his testimony was little more than a lecture on his favorite subject, one that he gives often, since he teaches medical students at Tulane and LSU on the detection of malingering, and on factitious disorders in personal injury and workers' compensation claims.  The problem with Dr. Culver's expertise is that he is rarely in the position of his medical students who will actually treat patients with physical problems and who will therefore benefit from the detection of malingering and psychological disorders affecting the accuracy of their diagnoses.

More specifically, Dr. Culver rarely treats patients at all.  He certainly did not treat Mr. Fontenot for any physical or psychological ailment, nor did he observe him while being treated by another physician in order to determine whether he was malingering.  Dr. Culver certainly never observed Mr. Fontenot malingering while Dr. Culver took historical information from him about his parents.  When examined about his own practice, Dr. Culver admitted that he had retired from hospital practice nine years earlier and that his current practice consisted of eighty percent forensic psychiatry.

Research of reported Louisiana state cases indicates that Dr. Culver has testified in approximately thirty-eight cases heard by Louisiana appellate courts, apparently in all but the second circuit.  The overwhelming majority of Dr. Culver's psychiatric opinions have been rendered in workers' compensation cases wherein he testifies for the employer, opining that the claimant is either a malingerer, or had pre-existing conditions, or had factitious or Munchausen or other psychological disorders defeating his or her claim.  Further, the thirteen-page letter that Dr. Culver received from Corvel, describing Mr. Fontenot's medical history and treatment, specifically asked Dr. Culver to give an opinion on Munchausen Syndrome, which appears rather suggestive in our estimation.

Dr. Culver testified that he did not read the letter prior to meeting with Mr. Fontenot, so as not to conduct his interview with preconceived notions. This testimony is specious because he next points out that, pursuant to his bill for services, he did not review Corvel's materials until September 20, over a month after his appointment with Mr. Fontenot. Dr. Culver then admits that he dictated his sixteen-page report the day *after* reviewing the material, without benefit of a tape of the month-old interview or the results of any psychological testing. In fact, Dr. Culver clearly stated that he is not a psychologist and does not perform psychological testing.

In support of its position, Wal-Mart argues that Dr. Stubbs, the orthopaedic surgeon who performed Mr. Fontenot's knee surgery, and Dr. Stephens, the plastic surgeon in Baton Rouge who tried to heal Mr. Fontenot's wounds, both suspected Mr. Fontenot of self-inflicted injuries before his examination by Dr. Culver. However, the record reveals that neither of those physicians diagnosed Munchausen Syndrome or factitious disorder, and neither physician had seen Mr. Fontenot exhibit such conduct. Their concerns seemed to be based largely upon the fact that they could not explain the healing complications during their treatment of Mr. Fontenot. Dr. Stubbs, who performed the knee surgery in June 2003 and subsequently performed irrigation and debridement of the knee, was baffled by the recurrent subcutaneous hematoma. However, he referenced interruptions in his care of Mr. Fontenot stating that there were "numerous negative interactions with the Workers' Comp case manager resulting in [his] being taken for orthopaedic care elsewhere." Dr. Stubbs thought something else must be going on and suggested that a psychological evaluation might be in order.

The testimony of Dr. Stephens, who incidentally liked Mr. Fontenot and thought he was "the nicest guy in the world," revealed that his suspicions were based

upon a nurse's complaint during Dr. Stephens' visit with Mr. Fontenot at Promise Health Care in Baton Rouge. The nurse complained that she had told Mr. Fontenot to lie still and not cover his wound until she could return with dressing supplies for it. When she returned, Mr. Fontenot had pulled the bed covers over himself and over his wound causing a fifty percent disruption of his skin graft. This innocent accident was described as having the nurse running down the hall and informing Dr. Stephens that Mr. Fontenot had pulled off his skin graft. This characterization has been repeated and quoted numerous times, in spite of the fact that it is not true. The nurse was not even in the room when it happened. She did not see him pull off anything. Moreover, Mr. Fontenot explained that when she asked him not to cover his wound, he replied that he needed to cover himself (as he was wearing only his underwear), and she replied not to touch the wound.

Additionally, the record indicates that Mr. Fontenot had been given Demerol thirty to forty-five minutes before this event. Dr. Stephens admitted that Mr. Fontenot had been over-medicated, through no fault or requests of his own, and that this chemically-altered state could cause him to move without understanding the consequences of his movements. Even Dr. Culver admitted that this incident with the covers "was the only documented thing that was -- I guess you would say, *almost witnessed* --." The record contains logical factual explanations for each of the witch-hunting mischaracterizations applied to Mr. Fontenot's conduct in changing his dressings and managing his wounds. For example, he was criticized for changing his dressing before the home health nurse arrived. Mr. Fontenot had been instructed to change his dressing twice daily, early in the morning and at night. The home health nurse typically arrived between 10:00 a.m. and noon. Mr. Fontenot specifically asked how to address these late arrivals and was told to dress his wounds himself according

10

to schedule. Likewise, there was no substantiated evidence of "wound-picking." If a bandage was soaked and needed adjusting, and the nurses would not do it, he tried to keep the bandage over the wound. There simply is no evidence of the conduct alleged.

On cross examination, Dr. Stephens admitted that he had no understanding of Mr. Fontenot's position. He felt sorry for him and his wife but was exasperated with his problems and wanted him out of the hospital. Dr. Stephens testified that he had no knowledge of the underlying workers' compensation injury and back surgery that started Mr. Fontenot's odyssey, or the fact that his workers' compensation benefits were terminated. Dr. Stephens admitted that numerous occurrences could have caused Mr. Fontenot's wound not to heal, e.g., movement of any kind, because sheering forces in the wound could impair healing; or the Coumadin that he was given for a clot could have caused bleeding into the operated area of the knee, leading to a hematoma that then got infected, resulting in a wound. Mr. Fontenot had blood cultures indicating staff infections on several occasions as well.

Further, Mr. Fontenot testified that he had been bitten by a brown recluse spider around eight years earlier, and that since that time, he has had trouble healing. This was documented by several doctors who wanted to investigate the spider bite further and test Mr. Fontenot's immune system. The Corvel case manager even wrote a toxicologist regarding this issue, but never received a response. A consulting physician, Dr. John Rainey, commented on the spider bite and the inflamed areas at the IV sites and stated that Mr. Fontenot did appear to have some fibroblastic dysfunction with poor healing properties.

Dr. Thibodeaux, a board certified general surgeon and director of the Wound Care Center of Opelousas General Hospital, was Mr. Fontenot's treating wound care specialist from October 11, 2004 through November 22, 2004. During the first two weeks of treatment, he had reduced the size of Mr. Fontenot's wound by fifty percent, from thirty-five square centimeters to sixteen square centimeters. When Mr. Fontenot was discharged approximately four weeks later, the wound was down to a couple of centimeters. Dr. Thibodeaux clearly and succinctly articulated the protocol that he used to achieve such remarkable success after all of the failed protocols that Mr. Fontenot had endured. Biologically, Mr. Fontenot's wound had descended into a chronic state, repeatedly achieving a level of healing, but repeatedly failing to heal.

Contrary to Wal-Mart's assertion that the wound was infected and festered when Mr. Fontenot first went to Dr. Thibodeaux in October 2004, Dr. Thibodeaux stated that the wound was clean and free from infection but did not have a robust wound bed with the raised edges that indicate healing activity. He described various underlying problems that can prohibit healing. Individuals with Mr. Fontenot's short stature (5'4") sometimes have collagen vascular problems. In Mr. Fontenot's case, Dr. Thibodeaux had actually treated him in 2001, following his first back surgery with Dr. Morgan Lorio, for underlying chronic viral illness resulting in eruptions on his back at the lumbar surgery site.

For the present wound issue, Dr. Thibodeaux was concerned about the numerous protocols that had been attempted, including debridement, which can make things worse. Dr. Thibodeaux testified that there were approximately seven thousand wound products and advanced wound therapies that had been developed for chronic wound patients. He explained that collagen and proteins are needed at the wound site

12

for proper healing. "Proteases" are enzymes that break down proteins as a natural part of the healing process, as there is always some protein breakdown as other proteins are built up. However, wounds that reach a state of chronicity (chronic wounds) have been found to have a higher level of protease activity. Therefore, special therapies, or protocols, can be directed toward high protease activity.

Dr. Thibodeaux explained that the only approved wound dressing shown to bind up the excess proteases and take them out of the wound bed, allowing for appropriate protein build-up to occur, is called Promogran therapy. Promogran is a combination dressing that uses human collagen that is dehydrated, combined with cellulose, a plant material. The collagen and cellulose are combined and fashioned into a thin, sponge-like wafer that can be applied to the surface of the wound or packed into it. The proteases gravitate to the collagen; the dressing traps the excess proteases; and their protein breaking activity becomes muted in terms of the wound bed, thereby correcting the imbalance of wound healing proteins. When Promogran dressings were applied to Mr. Fontenot's wound, the successful result proved that excessive protease activity was causing the failure of his wound to heal. Dr. Thibodeaux testified that he had seen Mr. Fontenot's same scenario played out again and again on a regular basis. He further stated that Promogran therapy had only been out for a couple of years and that Mr. Fontenot was one of the first patients to get it.

Dr. Thibodeaux testified that Mr. Fontenot had never, including back in 2001, exhibited signs of factitious or Munchausen disorder. He further testified that when faced with repeated failures of a wound to heal, wound specialists do not jump to the conclusion that there is a psychological problem; they simply go to the next biological approach. He summarized Mr. Fontenot's previous treatment as not

13

inappropriate under the circumstances and stated simply that "the wrong people were directing traffic."

Dr. Burnell, Mr. Fontenot's family physician since 2001, knew his history of delayed healing and had treated him on more than one occasion where this occurred. Dr. Burnell testified that at no time had Mr. Fontenot exhibited signs of factitious disorder or Munchausen Syndrome. Dr. Burnell's impression of Mr. Fontenot during his visits was that he was a hard worker, a simple guy who liked to get his work done, and a quiet and compliant patient who never exaggerated or dramatized his complaints.

As a general rule, the testimony of a treating physician should be given greater weight than that of a physician who examined a claimant for diagnostic purposes only. *Winch v. Double M, Inc.,* 99-1793 (La.App. 3 Cir. 4/5/00), 764 So.2d 1055, *writ denied,* 00-1271 (La. 6/16/00), 765 So.2d 339. This is because the treating physician has the advantage of familiarity, since he or she is more likely to know the claimant's symptoms and complaints due to repeated examinations and sustained observations. *Alexander v. Autozone, Inc.,* 04-871 (La.App. 3 Cir. 12/8/04), 889 So.2d 366. Additionally, positive findings of medical experts are to be afforded greater weight than the negative findings as to the existence of a particular condition. *Campbell v. Luke Const. Co.*, 465 So.2d 688 (La.1985).

In the present case, Mr. Fontenot had a history of the delayed healing of his wounds. His family physician, Dr. Burnell, knew it; and his wound care specialist, Dr. Thibodeaux, knew it. Dr. Thibodeaux ultimately healed the wound at issue in this case, and, in a very short time. The trial court apparently disregarded their testimony in favor of the testimony of Wal-Mart's forensic psychiatrist, Dr. Culver, whose analysis was not factually-oriented to Mr. Fontenot's specific physical

and medical problems. Wal-Mart's argument that the orthopaedist, Dr. Stubbs, and the plastic surgeon, Dr. Stephens, had also suspected self-inflicted wounds has no merit because they were not wound specialists. Moreover, any reliance upon the plastic surgeon, Dr. Stephens, for terminating the benefits of a worker who has had back surgery and knee surgery, is insupportable. We find that the OWC's judgment terminating the benefits of Mr. Fontenot for self-inflicted injury under La.R.S. 23:1081(1)(a) was manifestly erroneous. Accordingly, we reverse the judgment and order Wal-Mart to pay all related medical expenses of Mr. Fontenot after the termination of benefits on September 28, 2004, particularly including those of Dr. Kerry Thibodeaux and Opelousas General Hospital.

**Wage Benefits**

Mr. Fontenot's attorney requests Temporary Total Disability (TTD) benefits from September 28, 2004, the date of Wal-Mart's termination of benefits, until such time as evidence demonstrates that the TTD benefits can be converted to Supplemental Earnings Benefits (SEB's). Wal-Mart argues that Mr. Fontenot is not entitled to TTD benefits because he worked for Prompt Succor Nursing Home after the termination of benefits on September 28, 2004. The record reveals that Mr. Fontenot did not begin working for the nursing home until August of 2006, which was well beyond the date of trial in early February 2006.[1] However, he did have other jobs before that time.

Mr. Fontenot underwent a functional capacity evaluation (FCE) on September 1, 2005, stating that he was limited to light duty work because of his lumbar injury and surgery, the torn medial meniscus, and right knee post-operative infection. The light duty was to consist of walking, carrying twenty pounds, and

---

[1]We are aware of this information because of an earlier appeal which is part of this record.

15

climbing stairs. However, Mr. Fontenot was not to stoop, kneel, crouch, or crawl, and not to perform static sitting or standing or prolonged walking. The record does not contain any evidence of rehabilitation assistance by Wal-Mart in the form of offering or helping Mr. Fontenot to find such a light duty position.

Notwithstanding, Mr. Fontenot, after much investigation, did find such positions for a period of time beginning around August 4, 2005. Therefore, we award TTD benefits from September 28, 2004 until August 4, 2005. Under La.R.S. 23:1221, Mr. Fontenot is entitled to sixty-six and two thirds percent of his pre-injury wages, which, with an average weekly wage of $488.00, would have been $21,634.67 (ten months plus one week x .666%). Beginning around August 4, 2005, Mr. Fontenot worked at a golf course until November 2005, then as a security guard at Evangeline Downs from November 2005 through the date of trial on February 6, 2006. According to the check stubs in the record, during that seven-month period, Mr. Fontenot earned $4,541.80 in gross wages. His wages at Wal-Mart during that time period would have been $14,802.69 ($488.00/wk x 52 ÷ 12 = $2,114.67/mo x 7 mos.). Under La.R.S. 23:1221, SEB's are sixty-six and two thirds percent of the difference between the pre-injury wages and the post-injury wages. The difference between $4,541.80 and $14,802.69 is $10,260.89. Hence, Mr. Fontenot's SEB's up until the time of trial total $6,833.75. Accordingly, we award Mr. Fontenot a total of $28,468.42 in SEB and TTD benefits through the time of trial.

Because of an earlier appeal for pauper status in January 2008, which was made part of this record, we know that Mr. Fontenot changed employment a few more times after trial. In April or May of 2006, he worked for St. Landry Security until August of 2006, at which time he became employed by Prompt Succor Nursing Home as a maintenance supervisor. He worked for the nursing home for one year,

until August 2007. However, there is not sufficient information in the record to calculate SEB's for those places of employment. While at these positions between 2005 and 2007, Mr. Fontenot testified that he continued to have swelling and discoloration at the wound area on his right thigh, and his leg became black and blue from the thigh on down the right leg. He was again diagnosed with cellulitis and another hematoma, which appear to have stemmed from the fall in the hospital in March 2003, following the back surgery in February 2003. Mr. Fontenot left his employment with the nursing home in August 2007 and that employer will not take him back until he is one hundred percent healed. Mr. Fontenot testified that Dr. Thibodeaux, who has been treating him, has also indicated that he will not release him to return to work until he is at one hundred percent as well.

Accordingly, it appears that Mr. Fontenot may again be entitled to TTD benefits. However, we do not have sufficient information to calculate wage benefits beyond the date of trial. Therefore, we enter judgment in favor of Mr. Fontenot and against Wal-Mart in the amount of $28,468.42 in SEB and TTD benefits, without legal interest, through the time of trial and remand the case to the OWC for a determination of benefits based upon wage and medical information accruing after the trial in February 2006.

With regard to Mr. Fontenot's claim for penalties and attorney fees for arbitrary and capricious claims handling by Wal-Mart's case management company, Corvel, we must decline to make such award. Corvel had documented suspicions of possible self-injury by Dr. Stubbs and Dr. Stephens, prior to the examination by Dr. Culver. Though none of these suspicions were well-founded, they provided a reasonable basis for Wal-Mart to controvert Mr. Fontenot's claim.

IV.

**CONCLUSION**

Based upon the foregoing, we reverse the portion of the judgment of the OWC terminating wage and medical benefits as of September 28, 2004, and we order Wal-Mart to pay all medical and pharmacy expenses related to the back injury and surgery in February 2003 and to the knee and thigh injuries, surgeries, and wounds stemming from Mr. Fontenot's fall in the hospital in March 2003.

We award TTD benefits of $21,634.67 from September 28, 2004 until August 4, 2005 and SEB from August 4, 2005 through the date of trial, February 6, 2006, in the sum of $6,833.75, with legal interest.

**AFFIRMED IN PART, REVERSED IN PART AND RENDERED, REMANDED IN PART.**

NUMBER 08-158

JOSEPH H. FONTENOT, JR.

VERSUS

WAL-MART

AMY, J., dissenting.

While the majority discounts many of the workers' compensation judge's evaluations in reaching its conclusion, I find an affirmation required in light of the deferential standard of review owed factual findings and credibility determinations. In short, my review of the record reveals support for the ruling that the employer sustained its burden of proving the defense of self injury under La.R.S. 23:1081(1)(a).

First, and as will be explained below, I do not find that the workers' compensation judge was required to reject the opinion of Dr. Rennie Culver. Dr. Culver diagnosed Mr. Fontenot as having a factitious disorder, which he described as "a form of pathological behavior in which, for no apparent purpose other than to assume the patient role, an individual will fabricate symptoms or signs of either physical or mental illness or both." Dr. Culver explained that "patients may inflict injury on themselves" and that they may do so "by a variety of means."

Further, the workers' compensation judge relied on medical records in determining that the employer proved self injury. After citing various portions of the medical records and the testimony of Drs. Stubbs, Stephens, and Culver, the workers' compensation judge referenced "emergency room records from Our Lady of Lourdes . . . wherein the doctor noted that Mr. Fontenot asked to be admitted to the hospital so that the staff could bring him his food and change his bed. It is also supported by

the sheer multitude of hospital admissions and medical procedures and tests Mr. Fontenot has undergone since his back surgery in February 2003."

Although Mr. Fontenot underwent knee surgery in June 2003, medical records detail the resulting wound's failure to heal and to remain healed. Corresponding depositions indicate that some of Mr. Fontenot's physicians were perplexed by his condition and began to suspect self injury. As noted by the workers' compensation judge, the records also contain several instances in which Mr. Fontenot was reported to be touching his wounds or making comments regarding continued hospitalization.

Dr. Malcolm Stubbs, an orthopedic surgeon, explained that he performed arthroscopic surgery on Mr. Fontenot's knee in June 2003, and that the resulting wounds were healing by Mr. Fontenot's July 14, 2003 appointment. His sutures were intact at that time. By the following week, however, Mr. Fontenot reported that the wound had opened. Mr. Fontenot was readmitted to the hospital on July 21, 2003 where Dr. Stubbs performed an additional surgery to "clean out this wound and wash out his knee." By this time, Dr. Stubbs was concerned that "something very unusual was happening." When Mr. Fontenot returned two weeks later, on August 5, 2003, the sutures were intact, but "he had a lot of redness around the wound and it did appear to be dehiscing once again."

Dr. Stubbs did not make a diagnosis related to self injury and explained that he was not qualified to do so. He stated, however, that he was concerned that Mr. Fontenot was injuring himself after the second surgery. He explained that "[f]or that just to keep recurring over and over without any signs of immunocompromised status of the patient, that's the first time that I recall that possibility occurring to me." Dr.

2

Stubbs stated that "this was an extremely unusual case that did not make any sense to me whatsoever."

Dr. Anthony Stephens, a plastic surgeon who also treated the non-healing right knee and thigh wounds, explained that he, too, became concerned about the possibility that Mr. Fontenot was injuring himself. Although Dr. Stephens initially tried conservative treatment, he closed the wound surgically in April 2004, using a skin graft to cover a portion of the wound. Mr. Fontenot was ordered to bed rest at a Baton Rouge hospital. Dr. Stephens explained that when he changed the dressing four or five days later, it appeared that healing was progressing and there was a "beautiful result at that point[.]" However, within two days the wound again "completely separated, the graph [sic] had sluffed completely free from the repair and he had the wound just as big as he had it from the beginning." Dr. Stephens confirmed that he considered intentional manipulation of the wound and that when he confronted Mr. Fontenot about that possibility, Mr. Fontenot denied self injury.

Thereafter, Dr. Stephens performed another skin graft procedure in May 2004. Dr. Stephens reported that when he visited Mr. Fontenot in the hospital several days after the procedure, the graft was a "100 percent take[.]" However, while he was recording his notes outside of the room, the "nurse comes running down the hall five minutes later saying he just pulled the graft off." Dr. Stephens denied that he accepted Mr. Fontenot's explanation that he was sedated when he did so and stated:

> Well, just the whole picture of this whole problem, I mean, we had a presentation from an arthroscopic procedure, a hematoma that gets infected, a non-healing wound that always, should heal with a wound vac, I've never seen it not, then we do an operation that essentially fixes the problem and it breaks apart as soon as I take the dressing off in two day [sic], which you just never see. I mean, I can understand a wound not healing and having a problem with a surgery but that usually

3

> presents itself maybe a week to two weeks later. The whole thing just does not add up.

Dr. Stephens explained that, although he suspected Munchausen's Syndrome, he did not make that diagnosis.

As noted above, Dr. Culver explained that he diagnosed Mr. Fontenot as having a "factitious disorder" based on his August 2004 exam and review of the medical records. Dr. Culver referenced records relating to Mr. Fontenot's back surgery, which he felt revealed suspicion of self-injury as early as 2001, as well as Dr. Stephens records regarding difficulty in healing of the knee wounds. Dr. Culver suspected that the factitious disorder may have had a much earlier onset and felt that the nurse's report of the skin graft incident corroborated his diagnosis.

While Mr. Fontenot contends, and the majority determines, that Dr. Culver's opinion should have been rejected since he was consulted for litigation purposes, I find no evidence in the record requiring such a rejection. Neither do I find that the workers' compensation judge was required to favor the opinion of Mr. Fontenot's choice of psychiatrist, Dr. James H. Blackburn. Significantly, it is the function of the workers' compensation judge to assess the weight of the testimony of lay and medical witnesses. *See Cannon v. Hamilton Transp.*, 06-1302 (La.App. 3 Cir. 2/7/07), 948 So.2d 1250, *quoting Ivy v. V's Holding Co.*, 02-1927, p. 7 (La.App. 1 Cir. 7/2/03), 859 So.2d 22, 28. In this role, the workers' compensation judge may accept or reject an expert's opinion depending upon "what impression the qualifications, credibility, and testimony of that expert make on the court." *Id.* at 1254. I believe that the reasons for ruling in this case reflect this type of evaluation. Neither the acceptance of the witnesses offered by Wal-Mart, nor the lesser weight placed on those of Mr. Fontenot was an abuse of discretion. *See Beverly v.*

4

*Boardwalk Constr.*, 00-219 (La.App. 3 Cir. 10/11/00), 771 So.2d 741, *writ denied*, 00-3096 (La. 1/5/01), 778 So.2d 1142. I see no indication that these evaluations should be performed anew on appeal. Although Mr. Fontenot contends that Dr. Culver's testimony should have been rejected as biased, counsel questioned Dr. Culver regarding his practice and the parameters of his examination. These facts were available for the workers' compensation judge's consideration. Thus, I would not disturb the ruling regarding La.R.S. 23:1081(1)(a).

Neither do I find merit in the remaining argument regarding the contention that the workers' compensation judge's approval of Wal-Mart's termination of benefits, effective September 28, 2004, was in error. These arguments are dependent on the assertion that undue weight was placed on Dr. Culver's testimony and too little placed on those of his own witnesses. In particular, Mr. Fontenot asserts that the workers' compensation judge should have dismissed Dr. Culver's testimony regarding a factitious disorder and/or self injury due to the ultimate healing of the wound. Mr. Fontenot contends that the trial court should have accepted Dr. Thibodeaux's assertion that the wounds' initial failure to heal had a biological basis. As explained above, I find this assertion without merit as the workers' compensation judge found, with a permissible basis in the record, that Mr. Fontenot's complaints, as of September 28, 2004, were due to self injury. Thus, the record supports the determination that the employer proved the defense of La.R.S. 23:1081(1)(a). Further, the claimant points to no portion of the medical record or testimony indicating that Mr. Fontenot has ongoing work restrictions stemming from a work-related injury.

For these reasons, I respectfully dissent.

5