Judgment rendered November 18, 2020.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 53,449-LA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

Versus

JOSEPH ALEXANDER                          Appellant

* * * * *

Appealed from the
Twenty-Sixth Judicial District Court for the
Parish of Webster, Louisiana
Trial Court No. 93840

Honorable Allen Parker Self, Jr., Judge

* * * * *

LOUISIANA APPELLATE PROJECT            Counsel for Appellant
By: Annette Fuller Roach

JOHN SCHUYLER MARVIN                   Counsel for Appellee
District Attorney

HUGO A. HOLLAND, JR.
Assistant District Attorney

* * * * *

Before STONE, STEPHENS, and BLEICH (*Pro Tempore*), JJ.

**STEPHENS, J.**

This criminal appeal arises from the 26th Judicial District Court, Webster Parish, the Honorable Parker Self presiding. The defendant, Joseph Alexander, was convicted of two counts of abuse of office and sentenced to four years at hard labor, with all but one year suspended, on each count, to be served concurrently. Alexander has appealed his convictions and sentences. For the reasons set forth below, we affirm in part, reverse in part, vacate the defendant's concurrent sentences, and remand for resentencing.

## FACTS

In 2017, the defendant, Joseph Alexander, was elected as the mayor of Cotton Valley, Louisiana. Based on actions that he took during his term as mayor, Alexander was charged with three counts of abuse of office. In a bill of information filed on June 6, 2016, as amended on October 16, 2016, the state alleged that Joseph Alexander, the elected mayor of the Town of Cotton Valley, committed abuse of office in violation of La. R.S. 14:134.3 by:

> Count 1: on February 25, 2017, intentionally using the authority of his office, both directly and indirectly, to compel and coerce Cullen PD Chief Rosetta Harris and Cullen PD Officer Chris Lauderdale to forego arresting him for the offense of possession of marijuana;
>
> Count 2: on August 31, 2017, intentionally using the authority of his office, both directly and indirectly, to compel and coerce employees of an auto parts store to provide him with a battery for his private vehicle; and,
>
> Count 3: on November 14, 2017, intentionally using the authority of his office, both directly and indirectly, to compel and coerce the Clerk of Cotton Valley, Michael Magee,[1] to provide him with a $500 check for his personal travel.

---

[1] In briefs, the parties refer to the town clerk as Michael McGee; however, his trial testimony indicates that his last name is spelled Magee.

Alexander waived his right to a jury trial, and a bench trial was held on May 31, 2019. The trial court granted defense counsel's motion for acquittal as to Count 2, and found Alexander guilty as charged on Counts 1 and 3.

On August 16, 2019, the trial court sentenced Alexander to four years at hard labor, with all but one year suspended, followed by three years of supervised probation,[2] on each count, with the sentences to be served concurrently. Defense counsel filed a motion to reconsider, arguing that Alexander's sentence was excessive and that the trial court failed to adequately consider the mitigating factors. The trial court denied the motion to reconsider without providing reasons. This appeal followed.

## DISCUSSION

*Sufficiency of the Evidence*

In the defendant's first two assignments of error, appellate counsel argues that the evidence was insufficient to convict Alexander of either Count 1 or Count 3 of abuse of office. The defense asserts that to "compel" someone to do something requires some level of force exerted upon them or overwhelming pressure. As to Count 1, the defense argues that Alexander did not use his authority as mayor of Cotton Valley to compel or coerce Chief Harris or Officer Lauderdale, both law enforcement officers of the town of Cullen, to drop the charges against him. The defense emphasizes Chief Harris's testimony that she was not pressured to dismiss the charges, and that Alexander did not mention that he was the mayor of Cotton Valley other than by way of introduction. Further, Ofc. Lauderdale testified that he

---

[2] The trial court imposed special conditions of probation, including a $1,000 fine, costs, and 20 hours of community service per month.

did not believe that Alexander was trying to get the charges dropped because he was the mayor, but that he was trying to use their commonality of race as a basis to "stick together" and "look out for each other." The defense contends that Chief Harris made the ultimate decision to use her discretion to dismiss the charges, and that her decision was not based on anything that Alexander told Ofc. Lauderdale or the chief.

As to Count 3, the defense argues that Alexander did not use his authority as mayor to compel or coerce Magee, the town clerk, to write the $500 check. The defense notes that Magee testified that he wrote the check to avoid an argument with Alexander, and that he was neither forced nor coerced into writing the check. The defense claims that despite the acrimonious relationship between Alexander and Magee, bad blood is not enough to constitute coercion. Also, the defense argues that the state failed to prove that Alexander, on behalf of his nephew, was not entitled to the funds. The defense notes that Alexander told the investigating officer that the money was for the purchase of a used stove and refrigerator for the community center, an acquisition that the town council had approved.

On the other hand, the state asserts that the evidence presented at trial was sufficient to prove beyond a reasonable doubt that Alexander was guilty of both counts of abuse of office. The state argues that as the mayor of Cotton Valley, Alexander used his position of authority to compel or coerce two Cullen police officers to forego arresting him for possession of marijuana, and to compel or coerce the town clerk of Cotton Valley to provide him with a $500 check for personal travel expenses. Noting that credibility determinations are left to the sound discretion of the trier of fact, the state claims that the trial court accepted the testimony of the officers and

3

the town clerk as credible and rejected Alexander's version of the events as unbelievable.

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Tate*, 2001-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004); *State v. Carter*, 42,894 (La. App. 2 Cir. 1/9/08), 974 So. 2d 181, *writ denied*, 2008-0499 (La. 11/14/08), 996 So. 2d 1086. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. *State v. Pigford*, 2005-0477 (La. 2/22/06), 922 So. 2d 517; *State v. Dotie*, 43,819 (La. App. 2 Cir. 1/14/09), 1 So. 3d 833, *writ denied*, 2009-0310 (La. 11/6/09), 21 So. 3d 297.

The *Jackson* standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. *State v. Sutton*, 436 So. 2d 471 (La. 1983); *State v. Robinson*, 50,643 (La.

4

App. 2 Cir. 6/22/16), 197 So. 3d 717, *writ denied*, 2016-1479 (La. 5/19/17), 221 So. 3d 78.

Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. *State v. Mingo*, 51,647 (La. App. 2 Cir. 9/27/17), 244 So. 3d 629, *writ denied*, 2017-1894 (La. 6/1/18), 243 So. 3d 1064. If a case rests essentially upon circumstantial evidence, that evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438; *State v. Mingo*, *supra*. The appellate court reviews the evidence in the light most favorable to the prosecution and determines whether an alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. *State v. Calloway*, 2007-2306 (La. 1/21/09), 1 So. 3d 417; *State v. Garner*, 45,474 (La. App. 2 Cir. 8/18/10), 47 So. 3d 584, 587.

The appellate court does not assess the credibility of witnesses or reweigh evidence. *State v. Smith*, 1994-3116 (La. 10/16/95), 661 So. 2d 442. A reviewing court accords great deference to the jury's decision to accept or reject the testimony of a witness in whole or in part. *State v. Casaday*, 49,679 (La. App. 2 Cir. 2/27/15), 162 So. 3d 578, *writ denied*, 2015-0607 (La. 2/5/16), 186 So. 3d 1162.

Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. *State v. Crossley*, 48,149 (La. App. 2 Cir. 6/26/13), 117 So. 3d 585, *writ denied*, 2013-1798 (La. 2/14/14), 132 So. 3d 410; *State v. Speed*, 43,786 (La. App. 2 Cir. 1/14/09), 2 So. 3d 582, *writ denied*, 2009-0372 (La. 11/6/09), 21

5

So. 3d 299. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. *State v. Johnson*, 47,913 (La. App. 2 Cir. 4/10/13), 113 So. 3d 1209.

La. R.S. 14:134.3(A) sets forth the offense of abuse of office as follows:

> No public officer or public employee shall knowingly and intentionally use the authority of his office or position, directly or indirectly, to compel or coerce any person to provide the public officer, public employee or any other person with anything of apparent present or prospective value when the public officer or employee is not entitled by the nature of his office to the services sought or the object of his demand.

The term anything of value includes sex, money, or loss of simple human dignity. *State v. Seaton*, 47,741 (La. App. 2 Cir. 4/10/13), 112 So. 3d 1011, *writ denied*, 2013-1056 (La. 11/15/13), 125 So. 3d 1102.

In *State v. Seaton*, *supra*, this Court found that the evidence was sufficient to support the defendant's convictions for forcible rape and abuse of office. Regarding the abuse of office conviction, this Court noted that the defendant, who was employed as the assistant chief administrative officer for the City of Shreveport, came into contact with the victim through his job duties in supervising the operation of shuttle buses at a public event. When the victim requested to use a phone, the defendant did not offer to let her use his phone. Instead, the defendant drove the victim to his office in a nearly empty building, where she would be isolated and dependent on him, and he sexually assaulted her. *State v. Seaton,* 112 So. 3d at 1020. This Court found that the evidence was sufficient to show that the defendant intentionally used the authority of his office to coerce the victim to provide

6

sex, a thing of value that he was not entitled to receive by the nature of his office. *Id.*

In *State v. Thomas*, 2019-097 (La. App. 3 Cir. 10/23/19), 282 So. 3d 1124, the defendant pled guilty to abuse of office, and sufficiency of the evidence was not at issue. In *State v. Thomas*, the defendant received "sexual contact or intercourse" by using the authority of his position as a duly commissioned police officer, on more than one occasion, over a victim that was vulnerable due to her illegal activities.

*See also In re Jackson*, 2019-0164 (La. App. 1 Cir. 1/2/20), __ So. 3d __, 2020 WL 42051 (in which the First Circuit upheld the Civil Service Board's finding that the termination of two police officers was in good faith and for cause, even though the officers were acquitted of abuse of office; the court determined that the appointing authority proved by a preponderance of the evidence that the officers knowingly and intentionally used the authority of their office to coerce the victim to provide sex to a third officer).

Count 1 – the Cullen Charges[3]

Officer Lauderdale, a part-time police officer with the Cullen Police Department, testified that on February 25, 2017, he saw a car parked in the park in Cullen. As Ofc. Lauderdale drove up, he observed the driver, identified as Alexander, toss something inside the car. Ofc. Lauderdale then got out of his vehicle and made contact with Alexander, who said that he was waiting for his son's girlfriend. Alexander did not want Ofc. Lauderdale to look in the passenger seat area, but the officer walked around Alexander's car and saw a small plastic bag containing a green leafy

---

[3] Because Alexander was convicted only of Counts 1 and 3, the facts surrounding Count 2 will not be discussed.

7

substance that appeared to be marijuana, in plain view on the floor. When questioned about the substance, Alexander said that his son gave it to him to bring to his girlfriend, but Alexander did not know what was in the bag. Ofc. Lauderdale told Alexander that he suspected the substance was marijuana, and that Alexander was going to be arrested. Ofc. Lauderdale testified that he did not know Alexander, but noticed that his driver's license had a Cotton Valley address, so he called the Cotton Valley chief of police. Chief Terry Brown told Ofc. Lauderdale that Alexander was the mayor of Cotton Valley and the chief "didn't want anything to do with it," and to "do what [he had] to do." Ofc. Lauderdale placed Alexander under arrest, read him his rights, placed him in the police car, and called to have Alexander's vehicle towed.[4]

At that point, Alexander told Ofc. Lauderdale that he was the mayor of Cotton Valley and that Ofc. Lauderdale needed to call the Cullen mayor and police chief. Ofc. Lauderdale told Alexander that he was not calling anyone. Ofc. Lauderdale testified that Alexander told him that he was the mayor "multiple times" during the ride to the police station. When they got to the station, Ofc. Lauderdale let Alexander make a phone call, and Alexander called the mayor of Cullen. Ofc. Lauderdale then called Cullen Police Chief Rosetta Harris, and advised her of the situation. Chief Harris and the mayor of Cullen then arrived at the station. Ofc. Lauderdale overheard Alexander asking Chief Harris and the Cullen mayor to help him. Ofc. Lauderdale testified that his impression was that "it wasn't necessarily

---

[4] This information was substantiated by the call and wrecker logs of the Springhill Police Department; Cullen does not have its own dispatcher.

about he was the mayor," but that they needed to stick together because of their race.[5] Ofc. Lauderdale testified that before Chief Harris and the mayor of Cullen arrived, Alexander's relative, "Bey" Parish, arrived at the police station to bail Alexander out of jail. Ofc. Lauderdale told them the amount of the bond, $900, and "Bey" and Alexander offered to pay Ofc. Lauderdale that amount for the charge to "go away." However, Ofc. Lauderdale refused, telling them, "We can't do that. It don't work like that."

Ofc. Lauderdale testified that Chief Harris asked for his opinion on what to do, but he told her to do what she wanted to do with the case. Chief Harris told Ofc. Lauderdale that she was going to help Alexander and let him go home. Ofc. Lauderdale stated that although he was not instructed on what to do with the drugs he got out of Alexander's vehicle, he destroyed them since there was not going to be an arrest.

On cross-examination, Ofc. Lauderdale agreed that the mayor of Cotton Valley has no authority over officers in the Cullen Police Department. When asked if Alexander forced, compelled, or coerced him in any way to forego arresting him, Ofc. Lauderdale's response was "no." Ofc. Lauderdale testified that the decision to let Alexander go was left to Chief Harris' discretion, and not based on anything Alexander told Ofc. Lauderdale.

Chief Harris testified that prior to February 25, 2017, she had never met Alexander and did not know who he was. She stated that when she arrived at the police station, Alexander introduced himself to her and told her that he was the mayor of Cotton Valley. Chief Harris testified that

---

[5] Ofc. Lauderdale, Alexander, Chief Harris, and the mayor of Cullen are African American.

Alexander apologized for "what he was caught with"[6] and said that he would not come back to Cullen. Chief Harris told Alexander that he had put her in a "strange situation," but that she was going to use officer discretion this time and let him go. Chief Harris testified that the mayor of Cullen never came to the police station. Also, Chief Harris stated that Alexander told her that he was the mayor of Cotton Valley only one time. On cross-examination, Chief Harris stated that she exercised her discretion, as well as officer discretion, in deciding not to charge Alexander with a crime, and when asked whether Alexander forced, compelled, or coerced her not to charge him, she responded "no." On redirect, Chief Harris noted that Alexander was the only person they had caught with drugs in Cullen and then let go if they promise not to come back.

Alexander did not testify at trial. However, the state introduced the recorded statement Alexander made to Louisiana State Police investigators during their investigation. In his interview, Alexander recalled the events of February 25, 2017, and denied that the Ofc. Lauderdale found marijuana in his car. Alexander stated that he was sitting in his car near the park when he saw some people he knew. As he walked toward those people, he noticed Ofc. Lauderdale looking inside his car. Alexander walked back, got into his car, and started it. Ofc. Lauderdale approached and asked him for his driver's license and insurance card. Alexander claimed that as he reached in the glove box for his paperwork, he dropped some of the papers on the floor. As he reached down, he knocked the car out of gear and the car moved a

---

[6] Officer Lauderdale's description of the drugs he found in the passenger side floorboard of Alexander's car to the state trooper investigating these charges was a "dime sack," which is slang for a $10 bag of marijuana.

10

little bit. Alexander stated that he believed that Ofc. Lauderdale thought he was trying to run over him and got angry. Alexander got out of the car as instructed, and Ofc. Lauderdale arrested him for an open container violation and resisting arrest. Alexander claimed that there was an empty bottle, possibly a wine cooler, that his nephew had left behind in the car when he borrowed it. Alexander stated that Ofc. Lauderdale never searched his car, and denied that there had been any marijuana in the vehicle. Alexander claimed that when Chief Harris arrived at the police station in Cullen, he was able to convince her that he was not trying to do anything to Ofc. Lauderdale, he had just knocked the car out of gear, and the charges against him were dropped.

Sergeant Brian Driskill of the Louisiana State Police testified about his interview with Alexander. According to Sgt. Driskill, in the interview, Alexander admitted that he had marijuana in his car.[7]

Count 3 – the $500 Check

Michael Magee testified that he met Alexander while he was campaigning for mayor, and in January of 2017, Alexander hired him as the town clerk. As clerk, Magee was responsible for bookkeeping, paying bills, and making deposits. Magee stated that the relationship between him and Alexander soured toward the end of 2017. In late 2017, Magee resigned from his job as town clerk.

Magee testified that on the day of a town council meeting in November of 2017, Alexander told him that he needed $500 to go to

---

[7] This testimony, however, contradicts the responses given by Alexander during the recorded interview.

11

Alabama[8] to visit his sister.  Magee was busy with something else at the

time, and despite having concerns, Magee wrote the check as requested from

the town's general account.  The check, presented at trial as Ex. 9-10, was

dated November 14, 2017, and was written to Alexander for $500, with its

memo line stating "travel expense."  Magee testified that there was very

little conversation between the mayor and him about it, and he issued the

check because, at that point in their relationship, he "was done with the

arguing and the accusations."

When asked whether Alexander compelled or forced him to issue the

check, Magee stated, "He didn't force me or compel me to do it other than

the fact I was not wanting to hear his mouth anymore if I said no."  Magee

noted that if he ever told Alexander "no," there would be an argument, a

rampage, belittling, and name calling.  Regarding the argumentative

atmosphere, Magee stated that Alexander had accused him of being racist

and noted that Alexander incorrectly believed that Magee was part of the

recall effort to remove him from office.  Magee testified that the only reason

he issued the check to Alexander was to avoid an argument.

Magee testified regarding the normal protocol for payment or

reimbursement of travel expenses, which are required to be based on

documentation and the state rates, and noted that there was no

documentation to support the $500 check.  Magee stated that he had

conversations about the check with the Cotton Valley chief of police,

Camille Pulzone,[9] Stuart McMahen, and someone in the state auditor's

_____

[8] The destination of Alexander's intended destination was later corrected to
Atlanta during Magee's testimony.

[9] According to Magee, Ms. Pulzone told him that it was "totally" wrong to write a
check to the mayor for personal travel, but he wrote it anyway.  When asked why he

office. Ms. Pulzone, who does accounting work for the town, and McMahen, the town attorney, testified at trial regarding their conversations with Magee.[10]

Regarding Alexander's assertion that the funds were to pay for used appliances for the community center, Magee stated that a month before the $500 check was issued, Alexander asked him if the town could "pay off" his loan for a stove and a refrigerator, which he could then donate to the community center. Magee told Alexander that the town could not do that.[11]

In his recorded statement to police, Alexander noted that he believed that Magee was part of the conspiracy to remove him from office, and that there was a lot of tension between them. Alexander denied asking Magee for $500 to take a personal trip. Instead, Alexander claimed that the check was supposed to have been issued to his nephew, Robert Willis, for the purchase of a stove and a refrigerator. Alexander claimed that he told Magee that the community center needed a stove and a refrigerator, and that his nephew had a stove and a refrigerator for sale for $500. Magee agreed to the purchase and put the check in an envelope. Alexander and Willis then went to the nephew's bank to cash the check. However, when Alexander

wrote the check despite advice to the contrary, Magee stated, "[the mayor] should've never asked me for it."

[10] McMahen testified that Magee told him that the check was issued to Alexander for personal travel. McMahen asked Alexander about the check; the mayor denied that the check was for personal travel. However, Alexander did not offer any other explanation for the check. Ms. Pulzone testified that in 2017, Magee called her about a $500 check for personal travel for the mayor. Magee was concerned about whether he should write the check. Magee called Ms. Pulzone at the time he was writing the check, and told her that the mayor told him to log it as travel expenses. Ms. Pulzone advised Magee to code the check to "ask my accountant" and to talk to the state auditor about it because she did not believe the mayor was allowed to use money for personal travel.

[11] McMahen testified that at some point, the town council approved the purchase of a stove and refrigerator, and Alexander brought up the fact that the town had purchased the equipment.

and Willis realized that the check had Alexander's name on it, they went to his bank to deposit the check. Alexander stated that he gave $200 to Willis and "borrowed" the additional $300 from the proceeds so Alexander would have money in his pocket for his trip. Alexander stated that he did not get a receipt for the stove or the refrigerator, but claimed that the appliances were put in the community center a couple of days before he received the check. When asked why the check had "travel expense" in the memo line, Alexander stated that Magee had "set him up."

Detective Rod Johnson of the Louisiana State Police testified that he went to the Cotton Valley community center after Alexander's arrest to photograph the stove and the refrigerator. Det. Johnson stated that the refrigerator was not there when he arrived, but while he was there, city workers brought one in on a truck. He noted that both appliances were old with rust spots. It was Det. Johnson's impression that the only reason the refrigerator showed up was because he was there taking photographs.

Sergeant Driskill testified that in the recorded interview, Alexander eventually admitted that the $500 check was for a personal trip.[12] When asked how the business about the stove and refrigerator came up, Sgt. Driskill's response was:

> Great question. My opinion for that is that you've got two stories that Mr. Alexander combined to make one, and I think the actual truth is [what] I perceived [to be] the truth during the investigation [which is] that there was a check given for $500 and that it was for a trip, and there was also a stove and a refrigerator, which in my opinion, because of the investigation, was an attempt to cover up why he had the $500. And I think you got two stories commingled.

---

[12] This testimony is contradicted by the actual responses given by Alexander during his interview with Sgt. Driskill.

According to Sgt. Driskill, a week after the interview, Alexander provided him with a receipt prepared by Robert Willis[13] for the stove and the refrigerator. The handwritten receipt, presented at trial as Ex. 15, is dated November 9, 2017, which is before the date of the $500 check.[14]

The defense presented the testimony of Donald Shirley, a pastor in Cotton Valley who volunteered with the town in 2017 after Alexander was elected as mayor. Shirley described Alexander as authoritative, but not argumentative or abusive. He testified that Alexander never argued with or berated Magee, but he had heard Magee make demeaning statements toward Alexander, noting that Magee was often in disagreement with Alexander's policies.

In finding Alexander guilty, the trial court issued a written opinion setting forth the facts and the court's credibility determinations. As to Count 1, the trial court noted that it found the testimony of Ofc. Lauderdale to be "extremely credible" and Alexander's version of the events to be "unbelievable." Considering that Alexander's phone call following his arrest was to the mayor of Cullen and that Chief Harris indicated that Alexander "placed her in a difficult position," the trial court stated that it was satisfied that Alexander had "specific intent to indirectly coerce or compel [Chief Harris] to utilize her discretion to provide him with a thing of value to which he was not entitled."

---

[13] Sergeant Driskill noted that he also interviewed Willis, and that the information Willis gave was not consistent with the information Alexander provided. Willis could not be located at the time of trial.

[14] The receipt states, "I have a refrigerator and stove that is about 6 years old. It's a side by side refrigerator and the stove is a self-cleaning stove. Both are white. I will charge the Town of Cotton Valley $500.00 for both… Please keep and use this as your receipt."

In order to convict Alexander of abuse of office, however, the state was required to prove that Alexander **_knowingly and intentionally used the authority of his office,_** directly or indirectly, to compel or coerce another person to provide him with anything of apparent present or prospective value, to which he was not entitled to receive by the nature of his office. As the mayor of Cotton Valley, Alexander was a public officer at the time of the alleged crime. The testimony and evidence as to Alexander's actions in Count 1, together with his lack of candor regarding the incident, support the trial court's finding that Alexander had the requisite intent. Furthermore, the dismissal of criminal charges constitutes a thing of value that Alexander was not entitled to receive by the nature of his office.

There is no proof, however, that Alexander, while he made his status as mayor of Cotton Valley known to Ofc. Lauderdale and Chief Harris, used the authority of his position as mayor of a neighboring small town to obtain dismissal of the charges in Cullen, a town in which he had no jurisdiction, authority, "pull," or power. While Ofc. Lauderdale did testify that he felt that Alexander was attempting to use an "us vs. them" race mentality to influence the police chief's decision (which, if true, this would not have been the mayor using the authority of his political office to pressure the Cullen officers), there is no testimony that Chief Harris felt forced, coerced or compelled by Alexander to drop the charges. In fact, the evidence is to the contrary. Chief Harris was adamant in her testimony that the decision to dismiss the charges was made in the exercise of her discretion as an officer, not because of anything that Alexander said or did. Because an essential element of proof is lacking as to Count 1, i.e., that the dismissal of the charges against Alexander was obtained, directly or indirectly by a knowing

16

and intentional use by Alexander of his authority as mayor of Cotton Valley, there is insufficient evidence to support this conviction, which we hereby reverse.

As to Count 3, the trial court emphasized the credibility of the town clerk, Michael Magee, which was supported by: the receipt for the refrigerator and the stove, dated prior to the date of the $500 check; the refrigerator's absence from the community center when the investigator showed up to take pictures; and, the discussions Magee had with several individuals contemporaneously with his issuance of the check. Based upon the toxic work atmosphere that had developed between Alexander and Magee, the trial court stated that it was satisfied that Alexander "directly coerced or compelled Magee to provide him with a thing of value to which he was not entitled." The dynamics of the supervising employer/subordinate employee relationship inherently present in this case further support the trial court's conclusion that Alexander coerced or compelled Magee to give him the $500 check, as does the fact that Alexander's explanation for the purpose of the check metamorphosed from reimbursement for a personal trip to payment for used appliances for the town community center. There is sufficient evidence from which the trial court could have found that Alexander committed abuse of office as charged in Count 3.

*Excessiveness of Sentence*

The third assignment of error asserted by appellate counsel is that the concurrent sentences of four years at hard labor, with all but one year suspended, and three years of supervised probation, are excessive. We will pretermit a discussion of this assignment of error as unnecessary.

17

Inasmuch as this Court is reversing Alexander's conviction as to Count 1, the sentence imposed on that count will be vacated. In sentencing Alexander, the trial court imposed four-year sentences, with three years suspended and one year to be served imprisoned, on the two counts of abuse of office. Because these sentences were not only identical but were imposed to be served concurrently, this Court can safely assume that the trial court considered the two convictions together in fashioning its sentence. Rather than making any conclusions about how the trial court would have sentenced Alexander on a single conviction of abuse of office, we will vacate his sentence on Count 3, not due to a finding of excessiveness, but for reconsideration and resentencing by the trial court in light of the foregoing. *See*, La. C. Cr. P. art. 881.4(A).

## CONCLUSION

The conviction of the defendant, Joseph Alexander, as to Count 1 is reversed, and his concurrent sentences are vacated. The defendant's conviction as to Count 3 is affirmed. This matter is remanded to the trial court for resentencing as to Count 3.

**CONVICTION REVERSED AND CONCURRENT SENTENCES VACATED AS TO COUNT 1; CONVICTION AFFIRMED AND REMANDED FOR RESENTENCING AS TO COUNT 3**