WILLIAMS, J.
hThe defendant, Richard Seaton, Jr., was charged by bill of information with forcible rape, a violation of LSA-R.S. 14:42.1(A)(1), and abuse of office, a violation of LSA-R.S. 14:134.3. Following a bench trial, the defendant was found guilty as charged. Defendant’s motion for post-verdict judgment of acquittal was denied. The trial court sentenced the defendant to serve 15 years at hard labor for the forcible rape conviction, with the first three years to be served without benefit of parole, probation or suspension of sentence, and three years at hard labor for the abuse of office conviction, with the sentences to run concurrently. The district court denied the defendant’s motion to reconsider sentence. Defendant appeals his convictions and sentences. For the following reasons, we affirm.
FACTS
On December 27, 2010, K.W., an 18-year-old high school senior, attended the Independence Bowl held in Shreveport with her mother, Kimberly Barnes, her boyfriend, David Barnhill, and her grandparents. They were Florida residents who were staying at the Sam’s Town Hotel. The evidence contained in the record established the following events: K.W. probably consumed two 16-ounce cups of Jack Daniels and soda before the game and two beers during the game. After a disagreement with a person sitting behind them, K.W. and Barnhill left the stadium and began arguing with each other. Several officers saw the commotion and asked if K.W. was alright. A short time later, the officers arrested K.W.’s boyfriend after he refused to follow their instructions. K.W. pleaded with the police not to arrest her boyfriend, but the police stated that he would be taken to the ^Shreveport City Jail and gave K.W. his cell phone.
Corporal Ernest French, an employee of the Caddo Parish Sheriffs Office, was working that evening outside the stadium. He testified that K.W. was a short female with dark hair, a small frame and had a “strong odor of alcohol on her breath.” Corporal French testified that he saw de *1014 fendant at the scene helping with the shuttle buses. French stated that the defendant was tall and wore a dark trench coat. Corporal French testified that after the arrest of KW.’s boyfriend, the defendant touched French’s shoulder and stated, “I can do something with that, she’s cute. I’ll take her on.” Corporal French did not ask who defendant was referring to, but K.W. was standing nearby.
Shreveport Police Sergeant Keith Grant was supervising shuttle routes at the bowl game. Sgt. Grant testified that he was aware the defendant was the city’s contact person with authority regarding the operation of the shuttle routes. Sgt. Grant spoke with K.W. after her boyfriend’s arrest. He described her as a young woman who appeared to be 18 years of age, with a petite build, an approximate height of five feet and weight of 115 pounds. Sgt. Grant stated that she was upset and wanted to go to the jail to get her boyfriend released. Sgt. Grant attempted to help K.W. by advising her to ride the shuttle bus back to Sam’s Town. He also explained the booking process to her, but testified that she did not understand the process and kept repeating his words out loud to herself. Sgt. Grant testified that he told defendant that K.W. needed a ride, and the defendant stated that he could get her back to Sam’s Town. Once K.W. was | oseated on the shuttle, Sgt. Grant was under the impression she was returning to the hotel and he walked back to his assigned area. However, a short time later Sgt. Grant saw defendant driving K.W. away in a golf cart and was surprised because he thought she was going back to her hotel.
Charles McDuff, an operator of one of the shuttle buses, testified that defendant coordinated and supervised the shuttle buses. McDuff testified that at some point during the evening he saw that K.W. was “hollering and screaming,” that he could smell alcohol on her and that he believed she had been drinking based on her actions. McDuff testified that he overheard K.W. refer to defendant as “Officer Rick” and defendant said he was not an officer, but was an administrative officer for the City. However, when McDuff interjected to tell K.W. that defendant was not an officer, defendant then responded, “Technically, I am.” McDuff stated that after K.W. was seated on the bus she again asked about going to the jail and defendant stepped into the bus and asked K.W. if she was going on the bus or with him. K.W. then stood, exited the bus and left with defendant.
The defendant drove K.W. in the golf cart to a city-owned vehicle that he was using for the evening. K.W. testified that defendant placed his hand on her leg while driving her to the city jail. Then, when they arrived at the jail and she attempted to get out of the car, defendant pulled her back inside the car and started kissing her neck. She also stated that she asked defendant to stop during these acts and that she felt uncomfortable.
Jonathan Long, an employee of Louisiana Bail Bonds, testified that he spoke with K.W. at the jail and informed her that his company did not [4post bonds for out-of-state residents. He testified that K.W. began to cry, and told him that the detective who brought her there had been “touching her inappropriately, rubbing on her, kissing on her” and she had told him to stop. Long testified that K.W. offered him money for a ride, but that he could see she was upset, she was crying and he could smell the alcohol on her breath, so he did not give her a ride because of her condition. Long testified that when he walked out to the parking lot, the defendant asked him if he had been able to help K.W. and Long told defendant that he was unable to help her.
*1015 Surveillance footage from the waiting room of the jail shows defendant entering the building (after being buzzed in), standing over K.W., and motioning for her to leave with him. Defendant is also seen taking the list of the local bail-bonding companies and walking toward the door.
K.W. testified that she was crying and upset, that she told defendant that she needed to use a phone and go to an ATM, and that defendant stated that they were going to his office to use the phone and an ATM nearby. She stated that defendant never told her that he was carrying a cell phone with him at the time. After arriving and parking in the garage of Government Plaza, defendant used his access card to enter the building and the mayor’s office suite, a secured area on the second floor.
K.W. testified that she knew she was in defendant’s office because of the plaque on his door and the name in front of his seat. According to K.W., defendant started rubbing her back again and feeling underneath the layers of her clothes. K.W. testified that she asked defendant to stop, but that he [.^grabbed her and pulled her onto his lap and began to feel her stomach. She testified that she attempted to move away, but that defendant held her down. During these acts, K.W. testified that she told him to stop.
The defendant then asked K.W. if she had ever seen a mayor’s office before. K.W. testified that she wanted to go to the mayor’s office because she was hoping that more people would be around and that there would be a video camera present to prevent defendant from touching her. He used a card to enter the mayor’s office, which was secured by an electronic security system that required a key card to gain access. Upon entry, K.W. saw a bowl of lollipops and placed one in her pocket. She testified that defendant made sexual comments referring to the lollipop. K.W. testified that she asked to use a bathroom she had seen in the hallway of the second floor, but that defendant told her to use the bathroom in the mayor’s office.
While in the bathroom of the mayor’s office, K.W. sent the following text to her boyfriend: “Tell the police that officer john rape me baby plz 111 do anything for u but I can’t f##k this man no more.” K.W. testified that she had forgotten she had her boyfriend’s phone, which began to ring. K.W. then began to flush the toilet to drown out the ringing sound. She also sent her mother the following texts: “Mom ny5 fone die e im at mayor offic2e down-toen officer seaton helppppp,” and “mom, his name is rick seston.” K.W. testified that she sent these texts because she was afraid she would be raped and killed.
K.W. testified that as she exited the bathroom defendant grabbed her, pushed her against the wall and began kissing her neck. She stated that she Rtold him to stop, but that she was unable to fight him off. The defendant then pushed her onto the couch in the mayor’s office and began undressing her. She testified that her belly button ring was caught in her pants and was ripped out when defendant pulled down her pants. K.W. testified that she told defendant that she was on her menstrual cycle, but he pulled out her tampon and performed oral sex upon her. K.W. testified that she repeatedly told defendant no and asked him to stop.
After defendant finished, K.W. testified that he told her not to go anywhere'and left the room. She stated that when he returned a minute later, she could smell a “latex glove” scent that indicated he was wearing a condom. The defendant then vaginally penetrated her while she was on the couch. K.W. testified'that defendant next turned her onto her stomach and vaginally penetrated her again.
*1016 K.W. testified that she was visibly upset afterwards. She then followed defendant to the ATM outside the building. They returned to the mayor’s office to try to find her underwear and then defendant drove her to Sam’s Town. K.W. testified that she had memorized the car’s license plate number while in the parking garage. After being dropped off, she immediately went to a bar in the casino for a pen to write down the number.
K.W. was met in the hotel lobby by her mother and police officers. Her mother had received the texts and had filed a missing person report. Shreveport Police Officer Matthew Holloway testified that K.W. was crying and told him that defendant had raped her in the mayor’s office. She also handed him a piece of paper containing the license plate number and 17description of the city vehicle used by defendant.
Officer Tracy Mendels, an investigator for the Shreveport Police Department Crime Scene Investigations Unit, was called to Government Plaza and advised to look for a belly button ring. Mendels photographed, marked and collected evidence from the offices. The following evidence was secured from the mayor’s office: two DNA swabs from the couch cushion; one tape lift of long dark ham from the couch cushion; and one throw pillow from the couch with suspected bodily fluids. The following evidence was secured from the home of defendant’s father, with whom defendant was staying: a blue shirt and charcoal gray pants; a tube of sexual lubricant; two sex manuals; and a number of condoms. K.W.’s belly button ring, underwear, and tampon were never recovered.
Melanie Hubbard, an expert in the field of sexual assault forensic examination, testified that on December 28, 2010, she arrived at Schumpert Hospital after 1:00 a.m. and performed a sexual assault examination on K.W. Hubbard testified that K.W. was very upset and nervous with alcohol on her breath, that her eyes were bloodshot and she was crying. Hubbard testified that K.W. said she had consumed two alcoholic drinks and gave the details about her boyfriend’s arrest, the unwanted advances from defendant, her attempts to contact her mother and boyfriend, and the rape.
The medical examination revealed that K.W. had four “slits,” or lacerations, at the bottom of her posterior fourchette (vaginal opening). Hubbard stated that such slits were different from the norm and indicated “rough intercourse,” which could have occurred with or without consent. |sHubbard also testified that the dried secretions and blood in K.W.’s navel and the brown fluid around her cervix were consistent with K.W.’s narrative of having a body piercing and menstruating.
Jimmy Dale Barnhill, an expert in the area of forensic alcohol toxicology at the North Louisiana Criminalistics Laboratory, testified that test results showed K.W.’s blood alcohol level as .05 grams at 1:30 a.m. or 2:00 a.m. on December 28, 2010. Based upon the victim’s size, body weight and using “retrograde extrapolation,” Barnhill opined that K.W.’s blood alcohol level would have been somewhere between .11 and .16 grams percent at 8 p.m., and between .10 and .15 grams percent at 9 p.m.
Gerald Posey, a deputy and the Technical Resources Manager of the Caddo Parish Sheriffs Office, testified that the security cameras installed at Government Plaza were operated by the sheriffs office. He stated that five of the security camera videos from the evening of the crime had been deleted from the video index. However, Posey testified that he *1017 was able to access the video, which was stored on the system server.
Dale Sibley, Chief Administrative Officer of the City, testified that the defendant was fired on the evening of the incident because of his behavior, his use of the mayor’s office and a city vehicle. Sibley testified that defendant made the following statements to him, “I guess I kind of messed up ... I didn’t rape anybody ... And I think when all this is said and done, that will be clear. As a matter of fact, you know, I used a condom and it’s in the trash can.”
The defense called Dale Thomas, an employee for the City of | ^Shreveport, as an expert in the field of Information Technology. Thomas stated that only his office had access to the log report of the key-card security system and that he believed that no city worker had the necessary software to delete the video in the sheriffs system. Specifically, Thomas stated his belief that defendant was granted only “viewer rights,” not “administrative rights,” and so would have been unable to delete any videos.
The defendant testified that at the time of the incident, he was employed as the Assistant Chief Administrative Officer of Shreveport. He testified that on December 27, 2010, he was not armed with a firearm and wore charcoal gray pants, dark blue shirt, yellow tie, a black trench coat and an Independence Bowl lanyard pass around his neck. He testified that he observed the arrest of KW.’s boyfriend and was standing close to the police officers on the scene, but that he never indicated to K.W. that he was a police officer or that he was able to post her bond.
Defendant testified that he offered K.W. help by giving her the choice to ride with him to the city jail. He stated that he and K.W. kissed each other in his car outside of the jail and that he did not force himself upon her or threaten her. Defendant testified that while waiting in the parking lot he spoke with Long about K.W. posting a bond and that he was told that she could not be helped because she was from out of state.
Defendant testified that he then drove K.W. to Government Plaza to use the ATM and the phone, and that he used his access card to enter the building. He testified that K.W. sat in his lap while making phone calls, that he rubbed her back, that they went into the mayor’s office and that K.W. 110went to the bathroom. He asserted that they each took off their own clothes and had sex twice on the couch in the mayor’s office. Defendant stated that K.W. did not tell him to stop, that he did not threaten her and that he used a condom. He testified that he had not deleted any videos and that he had access to view the videos only.
On cross-examination, defendant theorized that K.W. was lying about being raped in an effort to get leverage against the city to get her boyfriend out of jail. He admitted telling Corporal French that K.W. was attractive, but asserted that she did not have slurred speech or an odor of alcohol at the time.
Defendant testified that he told K.W. that the bus ride would not cost anything because the bus operator was working for him, and that he had exerted authority over the bus driver with the police standing there. He also testified that he did tell K.W. that he was something like an officer in that he was the Assistant Chief Administrative Officer for the city. Defendant acknowledged that he could have taken K.W. to Sam’s Town or let her use one of his two cell phones to call bail bonding agencies instead of driving her to his work office after hours. He testified that he did *1018 not know how K.W.’s belly button piercing was ripped out and did not see a tampon.
At the conclusion of the bench trial, the defendant was found guilty of one count of forcible rape and one count of abuse of office. Defendant’s motions for post-verdict judgment of acquittal and to quash the abuse of office charge were denied. The trial court sentenced defendant to serve 15 years at hard labor, the first three years without benefit of parole, probation |nor suspension of sentence, for the forcible rape conviction and to serve three years at hard labor for the abuse of office conviction, with both sentences to run concurrently. The defendant’s motion to reconsider sentence was denied and this appeal followed.
DISCUSSION
The defendant contends the evidence was insufficient to support his convictions for forcible rape and abuse of office. Defendant argues the evidence did not prove guilt beyond a reasonable doubt because the victim’s testimony about the incident was contradicted by the timeline of events shown by the surveillance video and cell phone records.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Tate, 2001-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Murray, 36,-137 (La.App.2d Cir.8/29/02), 827 So.2d 488, writ denied, 2002-2634 (La.9/5/03), 852 So.2d 1020.
It is the function of the trier of fact to assess credibility and resolve conflicting testimony. State v. Thomas, 609 So.2d 1078 (La.App. 2d Cir.1992), writ denied, 617 So.2d 905 (La.1993); State v. Bonnett, 524 So.2d 932 (La.App. 2d Cir.), writ denied, 532 So.2d 148 (La.1988). The trier of fact hears the testimony first hand and unless the fact finder’s assessment of | i2believability is without any rational basis it should not be disturbed by a reviewing court. State v. Mussall, 523 So.2d 1305 (La.1988); State v. Combs, 600 So.2d 751 (La.App. 2d Cir.), writ denied, 604 So.2d 973 (La.1992). The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a fact finder’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App.2d Cir.2/25/09), 3 So.3d 685; State v. Hill, 42,025 (La.App.2d Cir.5/9/07), 956 So.2d 758, writ denied, 2007-1209 (La.12/14/07), 970 So.2d 529.
LSA-R.S. 14:42.1(A)(1) provides, in pertinent part:
A. Forcible rape is rape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because it is committed under any one or more of the following circumstances:
(1) When the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape.
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Gullette, 43,032 (La.App.2d Cir.2/13/08), 975 So.2d 753; State v. Burd, *1019 40,480 (La.App.2d Cir.1/27/06), 921 So.2d 219, writ denied, 2006-1083 (La.11/9/06), 941 So.2d 35. This is equally applicable to the testimony of victims of sexual assault. State v. Robinson, 36,147 (La.App.2d Cir.12/11/02), 833 So.2d 1207; State v. Ponsell, 33,543 (La.App.2d Cir 8/23/00), 766 So.2d 678, writ denied, 2000-2726 (La.10/12/01), 799 So.2d 490. Such testimony alone is sufficient even where the state does not introduce medical, scientific, or physical evidence to prove the commission of the offense by the defendant. State v. Robinson, supra; State v. Ponsell, supra.
In the present case, K.W. testified that the defendant physically pushed her onto the sofa in the mayor’s office, pulled off her pants and without her consent vaginally penetrated her twice. Defendant admitted he performed sexual intercourse with the victim, but asserted the victim had consented. In weighing the conflicting testimony, the court considered the findings of Melanie Hubbard, an expert in the field of sexual assault forensic examination, who testified that the four lacerations in the victim’s vaginal opening were consistent with rough sex and that the evidence which was collected corroborated the victim’s description of a sexual assault.
K.W. also testified that she repeatedly told the defendant “no” before and during the sex acts. The victim stated that she protested each time defendant made advances by pulling her toward him, kissing her, holding her in his lap and removing her clothes. In addition, the victim testified that she attempted to push defendant away and get free of his grasp, but she was physically overpowered by the defendant. The victim’s trial testimony concerning the incident was substantially consistent with her prior statements to the police and nurse examiner Hubbard.
The defendant’s primary challenge to the victim’s testimony relies on the synchronization of the times listed on the security video from the jail |14and Government Plaza and on the key-card records. However, the evidence indicates a lack of such synchronization. For example, the defendant’s submitted timeline shows he and the victim walking out of the jail at 8:51 p.m., so that they were not in. the car at that time. There was no evidence that they sprinted to the city vehicle and sped out of the parking lot, but the Government Plaza video shows the car driving into the garage at 8:53 p.m.
Thus, under the defendant’s timeline, he drove that distance in less than two minutes. Such a tight time sequence suggests the video cameras were not set to the same time. Dan Thomas, a defense witness, stated that the times of the video and card access systems would not match exactly. Thomas also acknowledged that an entry in exhibit D-6, a log of key-card access times at Government Plaza, did not make sense because the log showed defendant accessing the kitchen before leaving the stairwell when such a sequence was not possible.
In addition, the defendant’s timeline and testimony show that the victim’s text to the boyfriend’s phone could have been sent from a restroom as the victim recalled. However, the text would have been sent from the hallway restroom, which the victim used between 8:56 and 9:03 p.m., rather than the mayor’s restroom. Regarding the subject of the text, K.W. testified that she was trying to shock her boyfriend into somehow sending her help and that at the time she feared being raped by defendant based on his behavior up to that point.
We note that in his brief, defendant attempts to portray the victim as a sinister person plotting his downfall. This characterization is not supported 11r-by the record, *1020 which shows that defendant initiated the series of events leading to his commission of the crimes by intervening to get the victim off of the shuttle bus that would have returned K.W. to her mother at the hotel.
As the victim of sexual assault, K.W.’s testimony alone was sufficient to prove the commission of forcible rape by the defendant. Further, her account of the events that transpired was supported by scientific and physical evidence obtained shortly after the incident occurred. Based upon the evidence presented, the trial court could reasonably have found that K.W. was prevented from resisting the rape by defendant’s use of physical force. In convicting the defendant, the trial court chose to believe the victim’s testimony instead of the defendant’s claim of consensual sex.
After reviewing the record, we conclude that a rational trier of fact could have found that the essential elements of the crime of forcible rape were proven beyond a reasonable doubt. Consequently, the trial court did not err in finding defendant guilty of forcible rape.

Abuse of Office

No public officer or public employee shall knowingly and intentionally use the authority of his office or position, directly or indirectly, to compel or coerce any person to provide the public officer or any other person with anything of apparent value when the public officer is not entitled by the nature of his office to the object of his demand. LSA-R.S. 14:134.3. The term anything of value includes sex or money or loss of simple human dignity. State v. Arnold, 548 So.2d 920 (La.1989); State v. Hill, 40,023 (La.App.2d Cir.9/21/05), 911 So.2d 379.
| inIn the present case, defendant was employed as assistant chief administrative officer for the City of Shreveport at the time of the offense. This position qualifies defendant as a public officer or a public employee. The defendant came into contact with the victim through his job duties in supervising the operation of shuttle buses at a public event. When the victim said she needed a phone to call bail bond companies, the defendant did not help her with the cell phone he was carrying or by taking her to the hotel. Instead, the defendant drove K.W. to his work office in a nearly empty building, where she would be isolated and dependent on him. The defendant’s conduct supports a finding that he intentionally used the authority of his office to coerce the victim to provide sex, a thing of value that he was not entitled to receive by the nature of his office. Based upon this record, the evidence presented was sufficient to support the conviction of abuse of office. The assignment of error lacks merit.

Double Jeopardy

The defendant contends the trial court erred in allowing him to be charged with both abuse of office and forcible rape. Defendant argues that he was subjected to double jeopardy because the same evidence required to convict of one offense also supported conviction of the other.
A person cannot twice be put in jeopardy for the same offense. U.S. Const. amend. V; La. Const. Art. 1, § 15; LSA-C.Cr.P. art. 591; State v. Knowles, 392 So.2d 651 (La.1980). Louisiana uses both the “Blockburger test” and the “same evidence test” in determining whether double jeopardy exists. State v. Ceasar, 37,770 (La.App.2d Cir.10/9/03), 856 So.2d 236. In Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), the Supreme Court held that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine wheth *1021 er there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not.
Louisiana also uses the broader “same evidence” test, which provides that if the evidence required to support a finding of guilt of one crime would also have supported conviction of the other, the two are the same offense under a plea of double jeopardy and a defendant can be placed in jeopardy for only one. This test depends on the proof necessary for a conviction, not the evidence that is actually presented at trial. State v. Steele, 387 So.2d 1175 (La.1980); State v. Redfearn, 44,709 (La.App.2d Cir.9/23/09), 22 So.3d 1078; State v. Robertson, 511 So.2d 1237 (La.App. 2d Cir.1987), writ denied, 516 So.2d 366 (La.1988).
In the instant case, defendant was charged and convicted of two crimes: forcible rape (La. R.S. 14:42.1) and abuse of office (La. R.S. 14:134.3). The forcible rape charge requires proof of sexual intercourse and the prevention of resistance by force or threats of physical violence. The abuse of office charge does not require either of those elements.
In contrast, the abuse of office charge requires evidence that the offender was a public officer or employee, and the use of the authority of his office or position to obtain something of value for himself or another. These elements are not required in the charge of forcible rape. Thus, under the Blockbwrger test, the charges do not amount to double jeopardy.
11sIInder the broader “same evidence” test, contrary to defendant’s assertion, the evidence required to convict of abuse of office would not support conviction of forcible rape, which requires evidence of sex without the victim’s consent. Additionally, the evidence necessary to convict the defendant of forcible rape would not support conviction of abuse of office, which requires evidence that a public official intentionally used his office to coerce another to provide a thing of value to which he was not entitled, whether or not he was successful. Accordingly, this assignment of error is without merit.

Sentencing

The defendant contends the trial court erred in imposing excessive sentences. Defendant argues that less harsh sentences would accomplish the goals of punishment and rehabilitation.
An appellate court utilizes a two-pronged test in reviewing a sentence for excessiveness. First, the record must show that the trial court took cognizance of the criteria set forth in LSA-C.Cr.P. art. 894.1. State v. Smith, 433 So.2d 688 (La.1983); State v. Lathan, 41,855 (La.App.2d Cir.2/28/07), 953 So.2d 890. The important elements which should be considered are the defendant’s personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of offense, and the likelihood of rehabilitation. State v. Jones, 398 So.2d 1049 (La.1981); State v. Ates, 43,327 (La.App.2d Cir.8/13/08), 989 So.2d 259, writ denied, 2008-2341 (La.5/15/09), 8 So.3d 581.
Second, a sentence violates La. Const. Art. 1, § 20 if it is grossly out|1sof proportion to the seriousness of the offense or nothing more than a purposeless infliction of pain and suffering. State v. Dorthey, 623 So.2d 1276 (La.1993). A sentence is grossly disproportionate if, when the crime and punishment are viewed in light of the harm to society, it shocks the sense of justice. State v. Weaver, 2001-0467 (La.1/15/02), 805 So.2d 166.
A trial court has wide discretion to sentence within the statutory limits. Absent a showing of manifest abuse of that *1022 discretion, a sentence will not be set aside as excessive. State v. Black, 28,100 (La.App.2d Cir.2/28/96), 669 So.2d 667, writ denied, 96-0836 (La.9/20/96), 679 So.2d 430. The penalty for committing forcible rape is imprisonment at hard labor for not less than five nor more than 40 years, with at least two years to be imposed without benefit of parole, probation or suspension of sentence. LSA-R.S. 14:42.1(B). A person convicted of abuse of office shall be imprisoned for not less than one year and not more than five years, or fined not more than $5,000. LSA-R.S. 14:134.3(B).
Prior to imposing sentence, the trial court considered the guidelines of Article 894.1 and found that the defendant was in need of correctional treatment that could be provided most effectively by his commitment to an institution. Regarding defendant’s social history, the court was aware of his age, his family circumstances and that he had been employed. The court considered as mitigating factors the defendant’s expression of remorse, the letters submitted on his behalf and his lack of criminal history. However, the court found as aggravating factors the age and vulnerabilities of the 18-year-old victim at the time of the crimes.
|20In imposing the 15-year sentence for the forcible rape conviction, the trial court found that a lesser sentence would deprecate the seriousness of the crime. The record demonstrates that the trial court took cognizance of the sentencing guidelines in imposing a sentence at the lower end of the sentencing range for the offense of forcible rape. Based upon the circumstances of this case, where the defendant took advantage of a situation involving a young woman from out of state, the trial court did not abuse its discretion in imposing these concurrent sentences, which are not grossly disproportionate to the seriousness of the offenses committed. Thus, we cannot say the sentences imposed are constitutionally excessive. The assignment of eiTor lacks merit.
We have examined the record for error patent and found none.
CONCLUSION
For the foregoing reasons, the defendant’s convictions and sentences are affirmed.
AFFIRMED.