CARAWAY, J.
11 Willie Mims was convicted by a 10-2 jury of the aggravated rape of 66-year-old L.S. He was subsequently sentenced to the mandatory term of life imprisonment. Mims now appeals, arguing that the state failed to present sufficient evidence to support the conviction. We affirm.

Facts

In the early morning hours of Christmas Eve 2013, L.S., a 66-year-old woman, was in her home in Minden where she lived alone. A local church had built and donated the home to L.S. and she had lived there for longer than she could remember. According to L.S., at approximately 1:00 a.m., she heard a noise on her front porch like someone throwing rocks. She went to the door and, without opening it, asked who was there. L.S. stated that the individual claimed to be police. L.S. did not open the door, but shortly thereafter heard her back door open. She testified that the map .came into her home,, grabbed her arms and forced her to have sex with him on the couch. L.S. denied knowing the man, who told her that if she reported the incident to the “law,” he would come back. L.S. stated .that after the crime, the man just stayed in her home like he lived there. When the sun rose, he left the house and she ran to her neighbor’s home and reported that she had been raped.
L.S. ultimately reported the incident to police and a rape kit was performed. Samples were taken via vaginal and cervical swabs and vaginal wash. More than three months later, a DNA match indicated that Mims’ DNA was present in the samples taken from L.S. Mims was arrested and |2charged with aggravated rape of a person older than 65 years of age. The jury found Mims guilty of aggravated rape by a vote of 10-2. He was subsequently sentenced to life imprisonment. This appeal ensued.

Discussion

On appeal, Mims’ sole argument is that the evidence was insufficient to convict him of aggravated rape. His argument rests on the fact that the sexual act was consensual and that Mims’ testimony was insufficient to show otherwise. Mims acknowledges his admission that he and L.S. engaged in consensual sex and contends that L.G’s allegations of her lack of consent and rape constituted the only evidence refuting his claim. He contends that her “different versions of events” did not sufficiently prove that an aggravated rape had occurred.[1]
*162 The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Tate, 01-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Carter, 42,894 (La.App.2d Cir.1/9/08), 974 So.2d 181, writ denied, 08-0499 (La.11/14/08), 996 So.2d 1086. This standard, now legislatively embodied in La.C.Cr.P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 05-0477 (La.2/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La.App.2d Cir.1/14/09), 1 So.3d 833, writ denied, 09-0310 (La.11/6/09), 21 So.3d 297.
The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App.2d Cir.2/25/09), 3 So.3d 685, writ denied, 09-0725 (La.12/11/09), 23 So.3d 913, cert. denied, 561 U.S. 1013, 130 S.Ct. 3472, 177 L.Ed.2d 1068 (2010); State v. Hill, 42,025 (La.App.2d Cir.5/9/07), 956 So.2d 758, writ denied, 07-1209 (La.12/14/07), 970 So.2d 529.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Speed, 43,786 (La.App.2d Cir.1/14/09), 2 So.3d 582, writ denied, 09-0372 (La.11/6/09), 21 So.3d 299.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. Speed, supra; State v. Allen, 36,180 (La.App.2d Cir.9/18/02), 828 So.2d 622, writs denied, 02-2595 (La.3/28/03), 840 So.2d 566, 02-2997 (La.6/27/03), 847 So.2d 1255, cert. denied, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004).
Credibility determinations are the province of the trier of fact. State v. Johnson, 38,927 (La.App.2d Cir.11/23/04), 887 So.2d 751; State v. Powell, 27,959 (La.App.2d Cir.4/12/96), 677 So.2d 1008, writ denied, 96-1807 (La.2/21/97), 688 So.2d 520. In the absence of internal contradiction or irreconcilable conflict with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient to support the requisite factual conclusion. Id.
Likewise, the sole testimony of a sexual assault victim is sufficient to support a requisite factual finding. State v. Demery, 49,732 (La.App.2d Cir.5/20/15), 165 So.3d 1175, citing State v. Watson, 32,203 (La.App,2d Cir.8/18/99), 743 So.2d 239, writ denied, 99-3014 (La.3/31/00), 759 So.2d 69. Such evidence is sufficient to prove the elements of an offense even when the state does not introduce medical, *163 scientific or physical evidence to prove the commission of the offense by the defendant. State v. Seaton, 47,741 (La.App.2d Cir.4/10/13), 112 So.3d 1011, writ denied, 13-1056 (La.11/15/13), 125 So.3d 1102.
A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La.App.2d Cir.8/30/02), 827 So.2d 508, writ denied, 02-3090 (La.11/14/03), 858 So.2d 422. A reviewing court may not impinge on the fact finder’s discretion unless it is necessary to guarantee the fundamental due process of law. State v. Casey, 99-0023 (La.1/26/00), 775 So.2d 1022, cert. denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000).
Rape is defined as the act of anal, oral, or vaginal sexual intercourse with a male or female person committed without the person’s lawful consent. La. R.S. 14:41.
Aggravated rape is defined in La. R.S. 14:42 in pertinent part as follows:
A. Aggravated rape is a rape committed upon a person sixty-five years of age or older or where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
(1) When the victim resists the act to the utmost, but whose resistance is overcome by force.
(2) When the victim is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution.
The specific testimony adduced at trial included the testimony of L.S. who described the incident as follows:
A: I was staying there at the house Christmas. And I was watching a show. I was by myself. I didn’t have nobody. All alone. I didn’t know he was there by that window. I didn’t hear him. And he was with cats over with' my kittens. Next thing you know he came up to the Ldoor and said he was the policeman. Said somebody called; said something about .somebody was around there, I didn’t open the door or nothing; I just stood. I didn’t open the door. I just don’t want to. And the next thing I know he had done come, through that door, back door, through them door. And he got me. ■ And he put me— .hand around me. And he told me he [sic ] I was going to do what he tells me to do. And he knows it. And that’s it. That’s all you what [sic ] to know?
Q: Did he — did he force you to have sex with him?
A: Oh. He told me to take my clothes and pants off. And he put his finger in me; told me to kiss it. And he- told me to get on the couch.
Q: And, [L.S.], did he' have sex with you?
A: Yes.
Q: And you did not want to have sex with him?
A: No.
Did you? Okay. <£>
A: No, sir.
Did he threaten you afterwards saying you better not tell anybody? <0
A: He told me not to call the law. And then he went off — he sit there for a while talking like he owned the house. Then he went off the porch. He didn’t go off the steps, he went off the porch. Like he done, done something proud. And he went to the mailbox and telling me he’d be back. And I left right after he left.
*164 L.S. also testified that “he went in my house and. raped me.” She admitted that she did not fight or physically resist her assailant. She only returned to the house to feed her dog because she is too scared to stay there alone.[2]
|7L.S.’s neighbor, James Potts, also testified at trial. ' He explained that he had lived next to L.S. for 10 years and would check on her every few days. He described L.S. as a lonely woman with a dog, but no family or boyfriends. Potts stated that “she hardly ever leaves her house or goes anywhere.” He testified that he was aware of visitors at L.S.’s house and that he never saw Mims visit. Potts" explained that it was about 9:30 a.m. on Christmas morning when L.S. came to his door. He described L.S. as follows:
A: She was just — she was scared, crying and when she showed up at my door. And I asked her what was wrong. She told me she had been raped.
He also described L.S. as very emotional, unable to talk, and “crying uncontrollably. She was scared to even tell me what happened.” Potts related that L.S. was scared to report the incident because the man had threatened her. In his view, she seemed genuine in her distress.
Potts eventually called the Minden Police Department arid reported the incident. He spoke with Captain Dan Weaver, who urged Potts to have L.S. contact him.
Weaver testified at trial that he was familiar with L.S. and knew where she lived from working in the neighborhood. He described L.S. as a “loner” and testified that he did not recall ever seeing anyone at her home. He stated that she kept to herself and did not like anyone bothering her. Weaver confirmed that after the call from Potts, L.S. called him to report the rape, “within the next couple of days” after the crime. He stated that “she was crying, very upset, very fragile.” He instructed her to bring the clothing |sshe had been wearing when the incident occurred and to come to the police station.
. L.S. described the incident to Weaver as noted above in her testimony. She was not able to identify her assailant. L.S. told Weaver, that after the crime, the assailant “kind of just stood around like he lived there.”. Neither L.S. nor her assailant went fo sleep during that time. She told Weaver that her assailant did not talk much but said some things about Florida that she did not understand. He did not eat or drink anything. L.S. told Weaver she feared for her life. Weaver noted no trauma or injury to L.S., but felt that she was not capable of resisting because she thought the man was going to kill her. He conducted surveillance of the neighborhood and her house after the crime from the time he interviewed L.S. “until "after the first of"the year.”'
Weaver took photographs of L.S. and the scene that were introduced into evidence. He testified that the door was not “knocked off the hinges, but you could tell it had been forced open.” In Weaver’s opinion, it was “a door that she probably didn’t use that much,” but “you could tell someone did come in through that backdoor into her house.” He recalled.that the door was locked. Weaver identified, photographs of the door, the couch and L.S.’s clothing. Because police ultimately obtained a “crime "lab riiateh,” these items were not tested.
Weaver testified that L.S. was immediately taken to the hospital where forensic sexual assault nurse examiner (“SANE”) *165 Tiffany Endel utilized a physical evidence recovery kit (rape kit), which included a vaginal 13and cervical swabbing and a vaginal wash for possible DNA evidence. He described L.S.’s demeanor at the hospital:
I could tell — the most 'fragile person that I’ve ever dealt with the 24 years I’ve been in law enforcement at the police department. I stayed there with her the whole time until the SANE nurse had got there. I also stayed at the hospital while the SANE nurse did the examination.
Nurse Endel also testified at trial. She testified that L.S.’s demeanor was consistent with someone who had been raped, i.e., L.S. was very tense, very frightened and very anxious. L.S. reported to Endel that the man had come into her house through the back door, grabbed her and told her to take off her clothes. Endel related that L.S. said that the man penetrated her with his finger and had sexual intercourse with her. She testified that L.S. told her that afterwards, the man sat on her couch and “just watched her.”
Endel further testified that it was two days after the crime that she conducted a complete physical examination along with the collection of DNA evidence. L.S. showed no signs of physical trauma, no bruising, bite marks, scratches or trauma to her genitalia. Endel testified, however, that it was not unusual for there to be no physical trauma if the elderly, frail victim did not physically resist her assailant. Endel stated that the window for viable DNA samples post-sexual activity is 72 hours. Thus she explained that the examination of L.S. occurring within 48 hours of the incident produced viable evidence.
Endel also testified that L.S. told her that, after the sexual intercourse, the assailant stayed at her home and “sat on her couch and just watched | inher.” L.S. told Endel that he told her he lived in a trailer in Sibley, what church he attended and that he had false teeth.
Michelle Vrana was accepted as an expert in forensic DNA analysis. Vrana testified about her analysis of the DNA evidence in this case including vaginal swabs, a cervical swab and vaginal washings. She determined sperm to be present on all three. The DNA profile from the vaginal swab was consistent with “being a mixture from two individuals.” She stated that the major contributor was consistent with L.S. The minor contributor from, that mixture “was consistent with the reference swab of Willie Mims.” Vrana testified that' “the probability of finding the same DNA profile as that minor contributor” from a randomly selected individual other than Mims, was “approximately one in twenty-two point nine thousands.” From the cervical swab, Vraiia testified that the DNA profile indicated that it was “two point one nine billion times more likely to be a mixture from [L.S.] and Willie Mims,” than a mixture from L.S. and an unknown, unrelated individual. Finally the profile from the vaginal washings was “four point two three billion times more likely” to be a mixture from L.S. and Sims, than a mixture óf L.S. and an unknown, unrelated individual.
Weaver was recalled to testify regarding his arrest of Mims and to authenticate a recorded statement made by him following his arrest. He explained .that, after the DNA match, was discovered, he determined that Mims did, in fact, live in Sibley, where he was located, .arrested and charged with aggravated rape.
InAn audio recording of Mims’ statement was introduced into evidence and played for the jury. ■, In the statement, Mims initially denied that he did anything to have prompted the arrest. He then stated that he met L.S. in 2011 when he was walking down her street and she was standing at her trash cans. He claimed *166 that his sister lived in the area and he was in that neighborhood. Mims admitted that sometime around Christmas 2018, although he could not recall the exact date, he saw L.S. again outside her house. Mims explained that it was dark, but before midnight, and L.S. was at her door letting her dog go outside when he was walking down the street. Mims stated that he began talking with L.S. and she invited him inside and the two had consensual sex.[3] He stated that she took off her own clothes and he took off his clothes and the entire episode was consensual. Mims declared that, when he left L.S.’s house, the two had discussed that he would come back and visit her again. He stated that several days later he went by her house and she was not home. He had not seen her since that time.
The state rested and the defense did not produce any testimony. When viewed in the light most favorable to the state, we find the evidence sufficient to support the jury’s verdict. It is undisputed that L.S. was over the age of 65 at the time of the offense. Mims admitted to consensual sexual intercourse with her, which was confirmed by the DNA analysis.
112The state’s proof regarding L.S.’s lack of consent included her testimony that the sexual intercourse was not consensual and that Mims raped her. The evidence indicated that Mims was not an acquaintance of L.S. and confirmed an unauthorized entry into her home. L.S. described how Mims grabbed her arms and told her to disrobe and get on the couch.
Additionally, Potts confirmed that L.S. was terribly distraught when she came to his home and reported that she had been raped. Weaver testified that, in his entire career, he had never seen a more fragile and broken victim. Endel corroborated this testimony, describing L.S. as very tense, frightened and anxious — characteristics consistent with someone who had been raped. Thus, L.S.’s demeanor immediately after the offense was consistent with her allegations. Likewise, her actions after the crime also corroborate L.S.’s claim. She was reluctant to report the rape out of fear from Mims’ threats to come back if she told “the law,” and has been unable to continue living in her home.
If believed, L.S.’s testimony corroborated by the other evidence of the occurrence is sufficient to support the jury’s determination that the intercourse was without L.S.’s lawful consent. This evidence was accepted by the jury and is sufficient to support the conviction of aggravated rape. Mims’ argument that the sexual acts were consensual is without merit.

Decree

For the foregoing reasons, we affirm Mims’ conviction and sentence.
AFFIRMED.

. Mims does not argue that there was an issue of L.S.’s lack of resistance and that the state failed to show the existence of the circumstances addressed under La. R.S. 14:42(A)(2). Notably, however, La. R.S. 14:42(A) was amended/reenacted in 1993 to include as a type of aggravated rape "a rape committed upon a person 65 years of age or older.” This type of rape is set forth separate from the six other acts that address the lack of lawful consent for aggravated rape under the statute. Because the state proceeded under the 65 or oldér portion of the statute, it was required only to prove L.S.’s age and lack of lawful consent. Proof of her level of resistance or *162 the force or physical threat exhibited by Mims was not necessary to support the conviction.

. L.S. did not recall that she told police that her assailant asked her about'a friend named Janet Faye. She testified that she knew a girl by that name, but did not see her regularly.

. On earlier cross-examination by the defense regarding the statement, Weaver testified that Mims told him that he was with L.S. for five or six hours. Weaver also indicated that Mims stated that L.S. "kept saying — making comments about a friend of hers,” named Janet Faye. When Weaver asked L.S. about her friend, she said she had not talked to her "in a long time.” No further investigation of this friend occurred.